**HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.,**
**Plaintiff,**

v.

**GRANITE BROADCASTING CORPORATION, DS Audible San Francisco, LLC, and DS Audible Detroit, LLC, Defendants.**

**C.A. No. 2205–N.**

Court of Chancery of Delaware,
New Castle County.

Submitted: June 26, 2006.
Decided: June 29, 2006.

---

Kevin G. Abrams, Matthew F. Davis, Abrams & Laster, L.L.P., Wilmington, DE; Jeffrey B. Storer, Randall W. Bodner, Holly J. Caldwell, Ropes & Gray, L.L.P., Boston, MA, for the Plaintiff.

Peter J. Walsh, Jr., Kevin R. Shannon, Timothy R. Dudderar, Potter Anderson & Corroon, L.L.P., Wilmington, DE; Stephen M. Baldini, Ira S. Dizengoff, Jamison A. Diehl, Akin Gump Strauss Hauer & Feld, L.L.P., New York City, for Defendant Granite Broadcasting Corporation.

Christian D. Wright, Young Conaway, Stargatt & Taylor, Wilmington, DE, for Defendants DS Audible San Francisco, LLC, and DS Audible Detroit, LLC.

## OPINION

LAMB, Vice Chancellor.

A holder of mandatorily redeemable preferred stock sues to enjoin certain sales of assets that, allegedly, both violate the terms of an indenture governing senior notes issued by the corporation and constitute transfers in fraud of the corporation's current and future creditors. The corporation moves to dismiss on the ground that the plaintiff is not a creditor and, thus, lacks standing to bring the claims asserted. While acknowledging that the weight of authority supports dismissal on this ground, the preferred stockholder argues that a recent change in GAAP accounting rules supports a finding that it has standing to proceed as a creditor under the applicable fraudulent conveyance laws. In support of this argument, it points to the fact that the corporation's own financial statements now treat the preferred stock at issue as debt, in accordance with FAS150. Thus, the question is posed whether the financial accounting treatment of this issue of redeemable preferred stock as debt, rather than equity or something between debt and equity, is a sufficient reason to confer standing on a holder of such stock to sue the corporation in the capacity of a creditor. Because the court's review of the terms of the redeemable preferred stock at issue reveals that the redemption feature has not and never will

give rise to a right to payment against the corporation, the court concludes that the plaintiff stockholder lacks standing to maintain this suit as a creditor.

## I.

### A. Parties

The defendant in this case, Granite Broadcasting Corp., is a Delaware corporation with its principal place of business in New York. Granite is a broadcasting holding company which owns or operates eleven television stations in the United States, largely centered in the Midwest and in New York state. The plaintiff, Harbinger Capital Partners Master Fund I, Ltd., is a fund organized under the laws of the Cayman Islands. Harbinger is the beneficial owner of approximately 38.6% ($77 million of liquidation preference) of Granite's 12¾% Cumulative Exchangeable Preferred Stock. A brief explanation here of the terms of those shares is necessary to understand this case.

The preferred stock has a stated coupon, denominated as a dividend.[1] Under the certificate of designation, which requires the corporation to "redeem, to the extent of funds legally available therefore" all shares at a fixed price plus accumulated dividends on April 1, 2009,[2] a dividend is effectively payable on that redemption date if the corporation has sufficient legally available funds to make payment. The certificate of designation further explains the consequences if Granite defaults on either its obligation to pay the cumulative dividend, or to redeem the shares. In sum, such a default would constitute a

"Voting Rights Triggering Event," entitling the holders of the preferred shares to elect the lesser of two directors or that number of directors constituting 25% of the members of the Board of Directors.[3] That voting remedy is described as "the exclusive remedy at law or in equity of the holders of the Exchangeable Preferred Stock for any Voting Rights Triggering Event."[4]

Further, the certificate provides for certain additional contractual protections for preferred stockholders. For example, the certificate imposes limitations on the amount of debt undertaken by the corporation, imposes restrictions on distributions by and to subsidiaries or affiliates of the corporation, and restricts certain kinds of mergers, consolidations, and sales of assets.[5] Moreover, Granite has the exclusive right to redeem the shares prior to 2009 at its option, so long as various conditions are met.[6] Additionally, Granite has the exclusive right to exchange these shares for the corporation's exchange debentures, dependent on certain conditions.[7] Although the indenture governing those currently non-existent notes appears to have been drafted, the terms of that instrument are not in the record.

### B. Facts

This case arises from the fact that Granite is currently in financial difficulty. Indeed, on June 30, 2006, it will be in default on its 9¾% Senior Secured Notes ("Notes"). In view of these financial difficulties, which the complaint acknowledges, on September 8, 2005 Granite entered into an agreement to sell two television stations

---

1. Def.'s Opening Br. Ex. A at (c)(i).

2. *Id.* at (e)(ii).

3. *Id.* at (f)(iii).

4. *Id.*

5. *Id.* at (*l*)(1)—(*l*)(viii).

6. *Id.* at (e)(i).

7. *Id.* at (g)(i).

in San Francisco and Detroit to AM Media Holdings, LLC for an aggregate consideration of $180 million. This proposal collapsed when the WB Network refused to extend the stations' respective network affiliation agreements. Consequently, the complaint alleges that Granite immediately began to seek new buyers for the two stations. On May 1, 2006, the same day the agreements with AM Media were terminated, Granite entered into an agreement to sell the assets comprising the San Francisco station to DS Audible San Francisco, LLC, and an agreement to sell the assets comprising the Detroit station to DS Audible Detroit, LLC, for an aggregate consideration of $150 million. Both agreements are contingent on the closing of the other.

In brief, the plaintiffs believe that these transactions are troubling for several reasons. First, the sales include two separate 5–year non-competition agreements, one with respect to each station, that restrict Granite's ability to re-enter either the San Francisco or Detroit markets. Harbinger believes that the fact that Granite is paid exactly the same amount for each agreement, despite the disparity in the sale price of the two stations, suggests that the non-competes are a "transparent ... attempt to avoid Granite's restrictions under the Senior Note Indenture in a manner harmful to creditors."[8] Second, Harbinger points out that the circumstances of the sale suggest a sort of duress, insofar as the new DS Audible buyers are backed by D.B. Zwirn, an important financing source for Granite. Together, these facts are alleged to show that the sales violate the Indenture agreement governing the Notes, only temporarily delaying Granite's inevitable bankruptcy at the expense of the company's present and future creditors.

In addition to violating the Notes indenture, under which Harbinger advances no claim, Harbinger believes that the proposed sales violate the fraudulent conveyance acts as they exist in New York, Michigan, and California, and therefore should be enjoined. The plaintiff also requests other forms of equitable and legal relief.

## II.

Granite has moved to dismiss the complaint on the grounds of standing, arguing that whatever the possible claims a creditor might have under the fraudulent conveyance statutes, Harbinger lacks the ability to bring those claims because, as a holder of preferred stock, exchangeable solely at the discretion of the company, it cannot possibly be considered a creditor under the relevant law. Rather, Harbinger is nothing but an equity holder with an interest in Granite, an interest which is cognizable in bankruptcy, and for which Harbinger might have valid fiduciary duty claims.

The plaintiff responds to this motion to dismiss by arguing that the kind of redeemable stock it holds is actually a claim on the corporation, and therefore Harbinger is effectively a Granite creditor. This contention is based mostly on the fact that, since 2003, the Financial Accounting Standards Board ("FASB") has required that mandatorily redeemable stock be treated as long-term debt for financial statement purposes. Therefore, Harbinger argues, even if FASB regulations are not determinative factors for this court, FASB's well thought out and deliberate decision to change the accounting treatment of such shares should at least raise an issue of fact for the court as to whether the preferred shares should be treated as debt or equity.

8. Compl. ¶ 34.

Therefore, in Harbinger's view, its complaint cannot be dismissed at this stage.

## III.

 In order to dismiss a claim under Court of Chancery Rule 12(b)(6), a court "must determine with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief." [9] A court must accept as true all well pleaded factual allegations in the complaint and all reasonable inferences to be drawn from those facts. But a court need not "blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." [10]

It is relevant to note that this case has come before the court on a highly expedited basis. Oral argument was held on June 26, 2006. Granite has represented to the court that, in order to meet its obligations under its debentures, it has a "drop dead" date of June 30, 2006, at which time the Notes trustee may accelerate repayment. In view of that exigency, the court necessarily issues its opinion in abbreviated format.

## IV.

 The complaint alleges that the proposed transactions at issue violate the fraudulent conveyance law under any of three possible applicable statutes: namely, the fraudulent conveyance laws of New York, California, and Michigan. The defendants make no argument as to which of these relatively similar uniform acts control, and nothing in the court's review of the precedent suggests that the result of this case would be any different under any of these statutes. Nonetheless, the court agrees with the plaintiff that the most reasonable law to apply under Delaware choice of law principles is that of New York, where the challenged closings are to occur, all parties have their principal places of business, and which is designated as the governing law by the purchase and sale agreements for the conveyances at issue. [11]

Thus, under the New York fraudulent conveyance statute, which is modeled on the Uniform Fraudulent Conveyance Act ("UFCA"), a creditor has the right to prevent or, if necessary, avoid a transfer made with the intent "to hinder, delay, or defraud either present or future creditors." [12] Because the defendants have not challenged on this motion to dismiss the sufficiency of the complaint, the only question at this stage is whether the plaintiff is a "creditor" under the UFCA and thus whether it has standing to bring this case. [13] The New York statute, accordingly, defines a "creditor" as any "person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." [14] If the plaintiff has such a claim against Granite, it is a creditor, and has standing to pursue its fraudulent conveyance allegations. [15]

9. *Grobow v. Perot*, 539 A.2d 180, 187 n. 6 (Del.1988).

10. *Id.* at 187.

11. Pl.'s Answering Br. 9 n. 6.

12. N.Y. Debt. & Cred. Law §§ 276, 279.

13. Def.'s Reply Br. 6 n. 3.

14. N.Y. Debt. & Cred. Law § 270.

15. *Glotzer v. Glotzer*, 111 Misc.2d 171, 443 N.Y.S.2d 812, 814 (Sup.Ct.1981) (holding that a plaintiff had standing to sue under the New York fraudulent conveyance statute because she was a bona fide creditor at the time of the conveyance).

Turning to that key question, the cases presented to the court appear almost unanimous in support of the conclusion that the preferred shares in this case are not debt, but equity, and therefore that Harbinger lacks standing to bring any claims as a creditor.[16] First, as the court observed during argument, a holder of preferred shares of a Delaware corporation has two foundational remedies on which to rely. Most obviously, our courts look to the certificate of designation to determine a preferred stockholder's rights. As Chancellor Allen held in *HB Korenvaes Investments, L.P. v. Marriott Corporation:*[17]

> Rights of preferred stock are primarily but not exclusively contractual in nature. The special rights, limitations, etc., of preferred stock are created by the corporate charter or a certificate of designations which acts as an amendment to a certificate of incorporation. Thus, to a very large extent, to ask what are the rights of the preferred stock is to ask what are the rights and obligations created contractually by the certificate of incorporation.[18]

Additionally, although "in most instances ... this contractual level of analysis will exhaust the judicial review of corporate action challenged as a wrong to preferred stock,"[19] there are some circumstances where an aggrieved preferred stockholder also has a right to pursue its claims on fiduciary duty grounds. Our courts have given examples of such prospective claims,[20] but one might generally say, as this court held in *Jedwab v. MGM Grand Hotels, Inc.*,[21] that preferred stockholders have access to fiduciary duty claims where the rights of common stock and preferred stock intersect.[22]

**16.** The plaintiff argues, at the threshold, that the definition of "claim" adhered to in bankruptcy cases should not be used as precedent in a fraudulent transfer case because the two statutory schemes are different, designed to serve different interests, and therefore cannot be construed together. While that is doubtless correct as a general matter, there is no operative difference in how the two statutes define the word "claim." Further, as Granite observes, the Official Comments to Section 1 of the Uniform Fraudulent Transfer Act, which is admittedly not in effect in New York, expressly describe its definition of "debt" as having been derived from Section 101(11) of the Bankruptcy Code. As to the UFCA, a court interpreting New York law has held that the fraudulent conveyance provisions of the bankruptcy code and those of the New York Debtor and Creditor Law are "typically us[ed] interchangeably" ... and can be treated collectively. *See In re AppliedTheory Corp.*, 323 B.R. 838, 840 (Bankr.S.D.N.Y.2005), *aff'd*, 330 B.R. 362, 2005 U.S. Dist. Lexis 20660 (S.D.N.Y. Sept. 21, 2005).

**17.** 1993 WL 205040, 1993 Del. Ch. Lexis 90 (Del. Ch. June 9, 1993).

**18.** *Id.* at *5, 1993 Del. Ch. Lexis 90 at *14.

**19.** *Id.* at *5, 1993 Del. Ch. Lexis 90 at *15.

**20.** *Id.* at *6, 1993 Del. Ch. Lexis 90 at *16–17 ("In fact, it is often not analytically helpful to ask the global question whether ... the board of directors does or does not owe fiduciary duties of loyalty to the holders of preferred stock. The question ... may be too broad to be meaningful. In some instances (for example, when the question involves adequacy of disclosures to holders of preferred who have a right to vote) such a duty will exist. In others (for example, the declaration of a dividend designed to eliminate the preferred's right to vote) a duty to act for the good of the preferred does not. Thus, the question whether duties of loyalties are implicated by corporate action affecting preferred stock is a question that demands reference to the particularities of context to fashion a sound reply.").

**21.** 509 A.2d 584, 594 (Del.Ch.1986).

**22.** *Id.* at 594 ("Thus, with respect to matters relating to preferences or limitations that distinguish preferred stock from common, the duty of the corporation is essentially contractual and the scope of the duty is appropriately defined by reference to the specific words of

■ What does seem clear, however, is that "the holder of preferred stock is not a creditor of the corporation,"[23] and therefore does not have access to the remedies available to a creditor in addition to those generally available to a stockholder.[24] Even where preferred shares in some way straddle the line between debt and equity, the cases which have grappled with that question in the context of bankruptcy law have held, almost universally, that those shares are forms of equity. In *Joshua Slocum Limited v. Boyle*,[25] for example, a bankruptcy court was faced with the claim that two classes of mandatorily redeemable preferred shares should be counted as debt on the debtor's balance sheet because, in the Trustee's view, they had many of the characteristics of a debt.[26] The court rejected that argument, noting that "the rights of shareholders to recover

dividends or to redeem their stock is dependent on the financial solvency of the corporation," and is therefore not a fixed liability the way a "claim" necessarily must be.[27] Indeed, the court noted, it is the creditors who have the right to challenge as a fraudulent transfer the wrongful redemption of preferred shares when the corporation is insolvent.[28] Other courts, relying on *Slocum*, have come to the same conclusion.[29] Thus, the touchstone of "equity" under these cases is whether the security holder has a legally enforceable right to payment.

The plaintiff's argument, importantly, is based on its belief that these cases no longer control. Indeed, the plaintiff believes that a change in GAAP accounting rules in 2003 undermines the cases that have found mandatorily redeemable preferred shares to be equity, and essentially

the contract; where however the right asserted is not to a preference as against the common stock but rather a right shared equally with the common, the existence of such right and the scope of the correlative duty may be measured by equitable as well as legal standards.").

23. *HB Korenvaes*, 1993 WL 205040, at *5, 1993 Del. Ch. Lexis 90, at *15.

24. *See HB Korenvaes Inv.*, 1993 WL 257422, at *14 n. 16, 1993 Del. Ch. Lexis 105, at *43 n. 16 ("Traditionally preferred stockholders have not been treated as creditors for the amount of the liquidation preference and the preference does not count as a 'claim' for fraudulent conveyance purposes") (internal citations omitted).

25. 103 B.R. 610, 623 (Bankr.E.D.Pa.1989).

26. *Id.*

27. *Id.*

28. *Id.*

29. *In re Revco D.S., Inc.*, 118 B.R. 468, 474–75 (Bankr.N.D.Ohio 1990) ("Generally the rights of shareholders to redeem stock are not

guaranteed but are dependent on the financial solvency of the corporation. Accordingly, the mandatory redemption provision of the convertible preferred stock is an interest and not a claim as New York Life asserts. New York Life's argument that it is a subordinated creditor of both Anac and Revco by reason of its claims for fraud in connection with the purchase of the preferred stock is unfounded and will not confer 'creditor' status on New York Life."); *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 523–26 (5th Cir.2004) (holding that "stock options, or the rights to exercise the stock option, are properly classified as equity security interests, not claims" because, inter alia, there was "no 'guaranteed' right to payment language, at specified intervals or otherwise, in the [relevant Rights Documents]"); *In re Federated Dep't Stores, Inc.*, 1991 Bankr.Lexis 67, at *7–9 (Bankr.S.D.Ohio Jan. 23, 1991) (holding, in a case where the issue was "whether the mandatory redemption of the preferred stock turns the preferred stockholders' equity interest into debt" for bankruptcy purposes, that the "mandatory redemption provision of the preferred stock is an interest and not a claim" because "stock redemption rights are contingent upon the financial health of a company.").

decides this case in its favor.[30] This change, promulgated by FASB under the name FAS150, requires companies issuing mandatorily redeemable financial instruments to report those shares as a liability rather than as equity. In FASB's opinion, this change was required to respond to "concerns expressed by preparers, auditors, regulators, and other users of financial statements about [the] issuers' classification in the statement of financial position of certain financial instruments that have characteristics of both liabilities and equity, but that have been presented either entirely as equity or between the liabilities section and the equity section of the statement of financial position."[31] Thus, Harbinger argues, the line of cases emanating from *Slocum*, to the extent that they ever controlled the question in this case, are no longer good law. Rather, because the court in *Slocum* placed "weight" on the corporation's treatment of the securities as equity, a treatment that has necessarily changed since FAS150, *Slocum* actually supports its own position that the preferred stock in question is a debt instrument, and thus gives rise to remedies under New York's fraudulent conveyance statute. This is confirmed, in Harbinger's view, by the fact that Granite has now changed its accounting practice in accordance with FAS150, and accounts for the preferred shares as debt. Thus, it argues, as a Maryland court held in *Costa Brava Partnership II v. Telos Corporation*,[32] where the question at issue was whether a preferred stockholder had standing to bring a fraudulent transfer claim under the relevant Maryland statute, the issuer's "own conduct seems to indicate that [the preferred stock] are debt."[33]

But FAS150 is not so determinative as the plaintiff asserts. To believe that it decides the case would grant FASB, which is neither lawmaker nor judge, the power to fundamentally alter the law's understanding of the role of preferred shares. Thus, if the plaintiff is correct, the remedies of a preferred stockholder of a Delaware corporation are no longer contract and (sometimes) fiduciary duty. Because the court would be required by FAS150 to treat preferred stock as debt, preferred stockholders would have lost the latter right entirely, and gained creditors' remedies instead. It is not credible to say, as the plaintiff's counsel urged at oral argument, that a preferred stockholder in that context would still hold rights to sue for breach of fiduciary duty in an appropriate case. That result would allow the same entity to sue in two different capacities on the basis of precisely the same instrument and the same operative facts, and thus would conflate the clear lines Delaware courts have always drawn between equity and debt holders.

Nor would FASB's power over Delaware law be constrained to the treatment of preferred shares. The court can imagine any number of other financial instruments whose accounting treatment might, in the future, be changed by FASB, and would

**30.** Pl.'s Answering Br. 12 ("Harbinger submits that, with the promulgation of SFAS 150 in 2003, the law of the characterization of hybrid instruments has evolved to the point where Granite's required financial statement treatment of the DEPS as a liability should be determinative of Harbinger's standing under the fraudulent conveyance laws as a matter of law.... Since Harbinger owns what SFAS 150 requires to be considered a liability for financial reporting purposes, Harbinger must have standing as a creditor under state fraudulent conveyance laws.").

**31.** Pl.'s Answering Br. Ex. B at 6.

**32.** 2006 WL 1313985 (Md.Cir.Ct. Mar. 30, 2006).

**33.** *Id.* at *5.

thus require some concomitant, and major, innovation in Delaware precedent. Further, if FASB ever shifted its view again, under this theory both Delaware and New York law would have to shift with it.

It is not the role of FASB to enact such significant changes in Delaware law, or in the fraudulent conveyance law of other states. Nor does FAS150 necessarily undermine *Slocum* and its progeny. The *Slocum* court did note the corporation's accounting treatment of the shares. But, reading the opinion as a whole, it is clear to this court that the decision in *Slocum* turned on the question of whether the stockholders had any guaranteed right to payment. As the *Revco* court held, citing *Slocum*, mandatory redemption provisions of convertible preferred stock is an interest and not a claim precisely because "the rights of shareholders to redeem shares are not guaranteed." [34]

Moreover, the significance of Granite's change in accounting is itself exaggerated by the plaintiff's argument. Prior to 2003, and FAS150, Granite treated these preferred shares as between a liability and equity for financial reporting purposes.[35] This has been changed, as a result of FAS150, to its current classification as purely debt. This change in Granite's balance sheet and income statement made no change in the terms of the certificate of designation, nor did it change, in any respect, the nature of Granite's payment obligation to Harbinger.[36] Simply put, the foundational issue of standing pursuant to a statute limiting suits to a certain kind of plaintiff is too weighty to rest on the slender reed of a corporation's decision to marginally revise its financial reporting in order to comply with FAS150.

The plaintiff's alternative argument is procedural in nature. If FAS150 does not control the result in this case, and the court must undertake some examination of the instrument at issue to determine whether it is debt or equity, Harbinger urges that such a determination is a factual matter and cannot be made on a motion to dismiss. According to the plaintiff, this court should follow the court in *Costa Brava*, which found the preferred shares at issue to have all the characteristics of equity, but nonetheless allowed the plaintiff's claim to survive a motion to dismiss for the purpose of permitting discovery on the issue of standing, based in part on the fact that the company treated the shares as debt on its balance sheet.[37]

*Costa Brava*, of course, is not controlling in this case, as the court there was interpreting Maryland law. To the extent the case represents persuasive authority,

---

34. 118 B.R. at 474.

35. *See, e.g.*, Granite Broadcasting, Annual Report (Form 10–K) at 27 (Apr. 1, 2002). This treatment was in accordance with FASB's recognition that before FAS150, "certain financial instruments that have characteristics of both liabilities and equity ... have been presented either entirely as equity or between the liabilities section and the equity section of the statement of financial position." Def.'s Answering Br. Ex. B at 6.

36. Indeed, as the plaintiff itself observed at argument, it might well be that Granite is not even required to report these preferred shares as liabilities, since it could be that the contingent nature of Harbinger's eventual payment under the preferred shares renders FAS150 inapplicable. The commentary to FAS150, which notes that shares that "allow the issuer to extend their term, defer redemption until a specified liquidity level is reached, or have similar provisions that may delay or accelerate the timing of a required redemption" should nonetheless be booked as liabilities, does not necessarily answer the question. The provision here quite clearly does not simply delay redemption, it may eliminate it altogether.

37. 2006 WL 1313985, at *5.

the court is equally persuaded by the fact that this court has on numerous occasions been able to make determinations as to the nature of a security from the face of the certificate of designation.[38] More pertinently, Harbinger's reliance on *Costa Brava* ignores the apparent factual complexity of that complaint. The defendant there had actually attempted to reclassify its preferred shares as debt because the redemption date had already passed, the company was insolvent, and the first tranche of its repayment obligations were due. The company's efforts were in vain, however, because the covenants in its credit facility forbade the acquisition of additional debt.[39] In the context of the impending repayment obligation, which triggered some unspecified remedy for the preferred shares, the *Costa Brava* complaint appears to have essentially alleged not only that the defendant was formally treating the preferred shares as debt, but that its very conduct was an attempt to consummate in fact the exchange transaction it could not complete under its credit facility. To the extent the Maryland court analyzed the issue of whether discovery was necessary, those facts appear to have created some disputed issues which could overwhelm the equity-like attributes of the preferred security.[40]

*Estate of Mixon v. United States*,[41] on which the plaintiffs also rely, clearly demonstrates the point made by the *Costa Brava* court. There, a federal court described 11 factors, in the context of a tax dispute, which could help a court determine whether a security was debt or equity. Most of the factors, as the court clearly held, were simply matters of law, easily discernible from the face of the instrument: these included the name given to the certificate, the presence or absence of a maturity date, the source from which the company was permitted to make repayments, among other things. The court noted that other factors such as the "intent of the parties" can sometimes be factual by nature. But as the court obviously recognized, those factors signify only where there is some reason to doubt the plain language of the instrument.

Tax disputes in this field often arise in ways that require such factual discovery. As the *Mixon* court explained, because of "the advantageous treatment accorded loans, stockholders of closely held corporations have preferred to begin operations with a small initial stock investment accompanied by a substantial loan of additional funds."[42] Thus, tax cases often raise the question of whether a loan, from the beginning, was a ruse. Translated into more general terms, the inclusion of subjective intent as a factor in the debt/equity calculus is merely a manifestation of the well known legal principle that the court will only look to extrinsic evidence in a

---

38. *See, e.g., HB Korenvaes*, 1993 WL 205040, at *6, 1993 Del. Ch. Lexis 90, at *18 (interpreting a certificate of designation as a matter of law); *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5, 2005 Del. Ch. Lexis 56, at *13 (Del. Ch. Apr. 29, 2005) (although holding in that case that a summary judgment standard was appropriate, noting that "a corporate certificate of designation is interpreted using standard rules of contract interpretation").

39. Telos Corp., Annual Report (Form 10–K) at 16 (May 23, 2006).

40. As the defendant also observes, the preferred shares in *Costa Brava* were characterized as "indebtedness" by the company's own charter. 2006 WL 1313985, at *5. That fact might also have animated the court's apparent belief that sufficient issues to justify discovery existed.

41. 464 F.2d 394 (5th Cir. 1972).

42. *Id.* at 402.

matter of contractual interpretation when there is ambiguity. Or, as the *Mixon* court observed, "it is not the jury's function to determine whether the undisputed operative facts add up to debt or equity. This is a question of law."[43] It only becomes a question of fact where, as in *Mixon*, the "objective signs point in all directions," forcing the court to look closely at the facts, including subjective intent.[44] Thus, nothing in *Mixon* or any other cases presented to the court suggests that, in the absence of pleaded facts that raise ambiguities on the face of the certificate of designation, a court must diverge from a purely legal determination of whether the fraudulent conveyance laws apply.[45]

This doctrinal framework appears to be in clear accord with the law of New York.[46] Particularly instructive is *In re Trace International Holdings, Inc.*,[47] which undertook to decide whether an issue of preferred shares was equity or debt under both the fraudulent conveyance provisions of the bankruptcy code and under New York's Uniform Fraudulent Conveyance Act.[48] The Trustee's claim would fail as a matter of law under those statutes if the issuer had issued debt and not equity, because, as the court observed, an antecedent loan could not be avoided under the fraudulent conveyance statute. In order to decide the question, which was complicated by the fact that the preferred shares at issue had been distributed pursuant to a multi-part transaction that included a loan, the court approvingly cited a Delaware federal court case with similar facts, *In re Color Tile, Inc.*[49]

In *Color Tile*, the court held clearly that the question of whether a security constitutes equity or debt turns on the "interpretation of the contract between the corporation and security holders."[50] That interpretation is informed, the court held, by numerous factors, many of which

---

**43.** *Id.* at 407 (*citing Tyler v. Tomlinson*, 414 F.2d 844, 850 (5th Cir.1969)).

**44.** *Id.* at 407.

**45.** Indeed, in a case cited by the plaintiff, the Supreme Court of the United States had no difficulty in deciding that a hybrid instrument was a form of debt as a matter of law. *Paulsen v. Comm'r of Internal Revenue*, 469 U.S. 131, 105 S.Ct. 627, 83 L.Ed.2d 540 (1985). Nor did either of the two courts below in that case appear to have done anything more than closely examine the disputed instrument. *Paulsen v. Comm'r*, 78 T.C. 291, 1982 WL 11157 (1982) (tax court); *Paulsen v. Comm'r*, 716 F.2d 563 (9th Cir.1983). In contrast, trial was clearly necessary in *Lane v. United States*, 742 F.2d 1311 (11th Cir.1984). There, a stockholder had advanced a corporation material sums in the form of a variety of notes and checks, and claimed that those payments ought to be treated as loans for tax purposes. Because there was no highly negotiated, formal instrument at issue, as is typically the case in a matter involving preferred stock, fact finding was necessary even to discover, for example, whether any interest at all had been paid on the notes. The dispute in this case is of a markedly different tenor.

**46.** The plaintiff cites as support for its position that New York law treats preferred stock as debt *Smith v. Kanter*, 273 A.D.2d 793, 709 N.Y.S.2d 760 (N.Y.App.Div.2000), where a verdict against a preferred stockholder on fraudulent conveyance grounds was affirmed without analysis of the issue of standing. That essentially summary affirmation is not in opposition to this court's conclusion, as the New York court could have found the plaintiff's claims to be cognizable under the debtor and creditor law for any number of reasons that make no difference to the disposition of the case *sub judice*.

**47.** 287 B.R. 98 (Bankr.S.D.N.Y.2002).

**48.** *Id.* at 106–107.

**49.** 2000 WL 152129, 2000 U.S. Dist. Lexis 1303 (Bankr D. Del. Feb. 9, 2000).

**50.** *Id.* at *4, 2000 U.S. Dist. Lexis 1303 at *14 (*citing Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del.1969)).

are identical to those in *Mixon*.[51] Crucially, the *Color Tile* court held language in the certificate of designation's (and the private placement memorandum's) liquidation preference which promised the preferred stockholders payment "out of the assets of the company available to its stockholders" to be a conclusive factor in its decision.[52] In the court's view, that language "dispelled" any "doubt as to the true nature of the preferred [stock]holders' interest,"[53] because it showed that:

> [T]he preferred [stock]holders enjoy priority only with respect to the funds available to stockholders, whose interests as a class are junior to the corporation's secured creditors in the context of liquidation. Thus, there is no certainty of payment of accrued dividends or of redemption of shares upon liquidation. Where such certainty of payment is missing, the security is equity, not debt.[54]

The New York court in *Trace* expressly relied on these holdings in making its decision. When considered among the other precedents detailed in the parties' briefs and this opinion, what emerges is that New York law is not in any way divergent from the law of its sister states on this issue.

Examining the Granite preferred shares in this framework leads clearly to the conclusion that these shares should be treated as equity for standing purposes. The defendants have conceded that these securities are classified as debt by Granite under FAS150. But, as this court noted above, that is not determinative. Nor does the complaint plead facts that suggest the kinds of factual issues that were at play in *Costa Brava* and in *Mixon*. Rather, the terms of the certificate of designation are clear and unambiguous and the question of whether the preferred shares are debt turns on an examination of those terms. What that analysis reveals is a hybrid security which falls decisively on the side of equity as a matter of law. Of course, the certificate of designation here calls the securities at issue "shares." But the fundamental reason that the preferred shares are equity is that they provide no guaranteed right of payment. As Harbinger has discovered, should Granite fail to perform, it has no financial rights other than a claim against the residual value of the corporation. In that sense, the fate of Harbinger's stock is tied directly to Granite's business fortunes, in a way that all the courts cited herein have held is peculiar to equity.

Moreover, under the certificate of designation, the shares at issue provide Harbinger no right to redeem, no current dividend payments, and no right to have a dividend declared. As the court observed in *Costa Brava*, "there is no relation of debtor and creditor between the corporation and preferred stockholders ... until the declaration of the dividend, when, in consequence, the obligation of debtor and creditor does arise."[55] Further, as the

---

51. These included the "name given to the instrument, the intent of the parties, the presence or absence of a fixed maturity date, the right to enforce payment of principal and interest, the presence or absence of voting rights, the status of the contribution in relation to regular corporate contributors, and the certainty of payment in the event of the corporation's insolvency or liquidation." *Id.* at *4, 2000 U.S. Dist. Lexis 1303 at *14 (*citing*

*Slappey Drive Indus. Park v. United States,* 561 F.2d 572, 581–82 (5th Cir.1977)).

52. *Id.* at *5, 2000 U.S. Dist. Lexis 1303 at *16.

53. *Id.*

54. *Id.* at *5, 2000 U.S. Dist. Lexis 1303 at *17.

55. 2006 WL 1313985, at *5 (*citing Heyn v. Fidelity Trust Co.,* 174 Md. 639, 649, 197 A. 292 (1938)).

certificate of designation makes clear, the preferred stockholders here do have a range of contractual rights against certain kinds of transactions. Although Harbinger is thus powerless in the sense that it has no vote in the corporation's management until a vote-triggering event,[56] it is bound contractually to Granite in the very way that our courts have held characterizes preferred stock. And, as the *Color Tile* court held was so vital, the liquidation preference in this case is tied directly to those assets of the corporation available for distribution to its stockholders.[57] That fact demonstrates convincingly that, before the investment at issue here went poorly, the unambiguous intent of the parties was to create an equity instrument.

Finally, the court notes that the indenture which would govern the preferred shares should they convert into debt is not in the record. If, as is likely, this indenture contains an equivalent no-action clause to that contained in the Notes indenture, it seems clear that even had Granite exercised its right to convert the preferred stock to debt, Harbinger would still lack standing to pursue a claim under to the New York fraudulent conveyance statute.[58] Of course, given the unsubstantiated nature of this observation, the court does not rely on this conclusion for its opinion. This point is included only to suggest that it would be an extraordinary result to infer, on the basis of FAS150, a possible right under the fraudulent con-

56. Although the right to vote is necessarily a characteristic right of equity, its absence is not fatal to a finding that a security is equity. Indeed, when such voting rights vest in the event of default, our courts have made precisely the opposite inference. *See Color Tile,* 2000 WL 152129, at *5, 2000 U.S. Dist. Lexis 1303, at *7 ("The fact that the preferred shareholders held equity is further evidenced by the fact that the Memorandum accorded shareholders voting rights if Color Tile failed to pay dividends for six consecutive quarters or if it failed to redeem the shares in 2003.").

57. Def.'s Opening Br. Ex. A at (d)(i) ("[I]n the event of any voluntary or involuntary liquidation, dissolution, or winding-up of the affairs of the Corporation, the Holders of shares of Exchangeable Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution *to its stockholders* an amount in cash equal to the liquidation preference for each share outstanding, plus, without duplication, an amount in cash equal to the accumulated and unpaid dividends thereon to the date fixed for liquidation, dissolution, or winding-up.").

58. The 9¾% Senior Secured Notes are governed by a no-action clause which requires, inter alia, that the holder of any Note seeking a remedy give the trustee written notice of the claimed default, and the holders of at least

25% in principal amount of the then outstanding Notes make a written request to the trustee to pursue the remedy. Def.'s Opening Br. Ex. B at § 6.6. The court notes that under New York law, no-action clauses of indentures are strictly construed. *See Cruden v. Bank of New York,* 957 F.2d 961, 968 (2d Cir.1992); *see also Continental Cas. Co. v. New York Mortg. Agency,* 1998 WL 513054, 1998 U.S. Dist. Lexis 12784 (S.D.N.Y.1998) (*citing Cruden* for the proposition that "no-action clauses are strictly construed"). Although there is some doubt as to whether even broadly drafted no-action clauses are operative against all kinds of claims, *McMahan & Co. v. Wherehouse Entm't,* 65 F.3d 1044 (2d Cir.1995) (holding that a no-action clause cannot bar a securities claim because of express contrary language in the 1933 and 1934 acts), a New York federal court has expressly held that no-action clauses may bar fraudulent conveyance claims if their terms are not complied with. *Victor v. Riklis,* 1992 WL 122911, at *6, 1992 U.S. Dist. Lexis 7025, at *20 (S.D.N.Y. May 15, 1992) ("until [the plaintiff] can demonstrate compliance with the no-action provision of the E–II indentures, he is precluded from pursuing his RICO and fraudulent conveyance claims"). The no-action language in the Note indenture is similarly broad to that in *Riklis,* and if the Exchange indenture contained that language, it would bar the current plaintiff from proceeding on its claims.

veyance statutes in a circumstance when the parties themselves might have contracted otherwise with those very statutes in mind. In any event, the factual context of this case, as pleaded, does not support the plaintiff's position.

## V.

For the foregoing reasons, the defendant's motion to dismiss is GRANTED. IT IS SO ORDERED.