# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GC BROADWAY, LLC, a California limited liability company, and BRYAN GORTIKOV, an individual,

      Plaintiffs,

      v.

AN SM 1925 BROADWAY HOLDINGS, LLC, a Delaware limited liability company, and ALEX NERUSH, an individual,

      Defendants,

      and

AN SM 1925 BROADWAY, LLC, a Delaware limited liability company,

      Nominal Defendant.

ALEX NERUSH, an individual; and AN SM BROADWAY HOLDINGS, LLC, a Delaware limited liability company,

      Counterclaimants,

      v.

GC BROADWAY, LLC, a California limited liability company; and BRYAN GORTIKOV, an individual,

      Counter-defendants,

      and

AN SM 1925 BROADWAY, LLC, a Delaware limited liability company,

      Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2024-1070-LWW

## MEMORANDUM OPINION

Date Submitted: December 5, 2025
Date Decided: February 26, 2026

Todd C. Schiltz, Angela Lam, FAEGRE DRINKER BIDDLE & REATH, LLP, Wilmington, Delaware; Robert J. Odson, Benjamin Leventhal Hicks, SHUMENER ODSON OH LLP, Los Angeles, California; *Attorneys for Plaintiffs/Counterclaim-Defendants GC Broadway, LLC and Bryan Gortikov*

Sean T. O'Kelly, O'KELLY & O'ROURKE, LLC, Wilmington, Delaware; Brian M. Grossman, TESSER GROSSMAN LLP, Los Angeles, California; *Attorneys for Defendants/Counterclaim-Plaintiffs AN SM 1925 Broadway Holdings, LLC and Alex Nerush*

Sean T. O'Kelly, O'KELLY & O'ROURKE, LLC, Wilmington, Delaware; *Attorney for Nominal Defendant AN SM 1925 Broadway, LLC*

**WILL, Vice Chancellor**

This post-trial decision resolves a dispute over a failed commercial real estate venture in Santa Monica, California. In January 2023, the plaintiffs invested nearly $8 million to rescue the distressed development project, securing a mandatory redemption by September 2024 and personal guaranties from defendant Alex Nerush. The relationship collapsed when the defendants defaulted on the redemption obligation. It worsened when the plaintiffs discovered Nerush had secretly leased the property—which was supposed to remain vacant—to a medi-spa and kept the rental income for himself.

After securing summary judgment on their corporate control claims, the plaintiffs proceeded to trial to enforce the guaranties and recover their financial losses. The defendants pursued a series of counterclaims related to usury and fraud, along with multiple affirmative defenses. The plaintiffs met their burden of proof; the defendants did not.

The evidence shows that the company failed to pay the required redemption price, triggering Nerush's obligation to make the plaintiffs whole under a payment guaranty. The plaintiffs also proved that Nerush committed fraud by actively concealing the unauthorized lease and misappropriating the resulting rents, making him personally liable under a recourse guaranty. The defendants' attempts to avoid liability through post hoc counterclaims lack factual and legal support.

1

Accordingly, judgment is entered in favor of the plaintiffs. Nerush is liable for over $7 million in principal damages for breach of the payment guaranty, $300,000 in restitutionary damages for the fraud, plus pre- and post-judgment interest and reasonable attorneys' fees.

## I. BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A. The Investment

This suit concerns a development project located at 1925 Broadway in Santa Monica, California (the "Property").[2] Nominal defendant AN SM 1925 Broadway, LLC (the "Company"), a Delaware limited liability company, was formed in December 2022 to hold a 90% interest in the site.[3] At the time of the events in question, the Property was the home of a dilapidated diner and a separate commercial building, both of which were intended for demolition to facilitate redevelopment.[4]

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 264) ("PTO"). The trial record includes live and pre-recorded testimony of 8 fact witnesses, 354 joint exhibits, and 12 deposition transcripts. Trial testimony is cited as "[Name] Tr." *See* Trial Tr. Vols. I, II, and III (Dkts. 288-90). Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined. *See* Am. Joint Ex. List (Dkt. 272). Pincites refer to internal pagination or, if a document lacks internal pagination, by the last four digits of Bates stamps. Deposition transcripts are cited as "[Name] Dep. __."

[2] PTO ¶ 4; Gortikov Tr. 11.

[3] PTO ¶ 4.

[4] *See* Gortikov Tr. 74; Nerush Tr. 503-04.

Defendant Alex Nerush, a sophisticated California-based real estate investor, partnered with WS Communities, LLC ("WS") to acquire and develop the Property.[5] Seeking capital to realize their vision, WS and Nerush approached plaintiff Bryan Gortikov—also a real estate investor—in November 2022.[6]

On November 28, 2022, WS, Gortikov, and Nerush executed a non-binding term sheet outlining the preliminary terms for predevelopment funding.[7] The term sheet granted Gortikov the "exclusive right to make [a] Preferred Equity investment" of at least $9.5 million in exchange for a "Preferred Return."[8] The term sheet included an "Alternative Structure" provision that gave Gortikov the sole discretion to "structure the investment as a loan" rather than a traditional equity investment.[9]

## B.  Pre-Closing Negotiations

On December 16, 2022, the Company and 1925 Broadway, LLC—an entity owned by affiliates of WS—purchased the Property as tenants in common.[10] The Company acquired a 90% interest in the Property, while 1925 Broadway (the "10% Owner") acquired the remaining 10%.[11] To govern their rights and responsibilities

---

[5] Gortikov Tr. 34; PTO ¶ 12.

[6] PTO ¶ 8.

[7] JX 13; PTO ¶ 9.

[8] JX 13 at 9; PTO ¶¶ 9-10.

[9] JX 13 at 5; PTO ¶ 11.

[10] PTO ¶ 12.

[11] *Id.*

regarding the Property, the parties entered into a Tenants in Common Agreement, which designated the 10% Owner as the party responsible for day-to-day management.[12]

The acquisition of the Property was financed through a mix of debt and equity. The seller, an entity called Carey – 20th and Broadway LLC, provided an $8 million loan.[13]  Nerush also contributed $16 million in equity derived from a "1031 exchange."[14]  A 1031 exchange, named after Section 1031 of the Internal Revenue Code, is a tax-deferral transaction allowing real estate investors to sell an investment property, reinvest the proceeds into a new property, and defer capital gains taxes.[15]

After the Property was purchased, the parties and their counsel negotiated the final terms of Gortikov's investment.[16]  The investor was plaintiff GC Broadway, LLC, a California limited liability company managed by Gortikov.[17]

---

[12] JX 66; PTO ¶ 13.

[13] PTO ¶ 14.  The original maturity date was extended to January 16, 2025.  *Id.*

[14] *Id.* ¶ 15.

[15] *See generally Like-Kind Exchanges Under IRC Section 1031*, Internal Revenue Serv. (Feb. 2008), https://www.irs.gov/pub/irs-news/fs-08-18.pdf; *see also Fawcett v. State*, 697 A.2d 385, 388 (Del. 1997) (explaining that the court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" (quoting Del. R. Evid. 201)).

[16] PTO ¶ 16; JX 13.

[17] PTO ¶ 5.

4

During negotiations, a dispute arose over the transaction's structure. On December 27, 2022, Nerush's counsel sent an email warning that securing GC Broadway's investment with a second deed of trust could be characterized as a loan from a "related person" under IRS rules.[18] Such a characterization, he said, could "imperil successful 1031 treatment for [Nerush's] exchange."[19]

To mitigate this risk, Nerush's counsel proposed two "possible alternatives for moving forward."[20] The first alternative was "eliminat[ing]" the second deed of trust and proceeding with a previously proposed membership structure for the Company.[21] This approach would allow the "'related person' inquiry [to] go[] away."[22] The second alternative was to restructure the deal so that GC Broadway "participate[d] as a second trust deed lender" without membership rights in the Company.[23] Counsel noted that the second option would require a "complete 're-set' and w[ould] push the closing into 2023."[24]

---

[18] JX 88.

[19] *Id.*

[20] *Id.*; *see* PTO ¶ 19; *see also* Nerush Tr. 476-77 (discussing the two options).

[21] JX 88.

[22] *Id.*

[23] *Id.*

[24] *Id.*; *see* PTO ¶ 19.

On January 13, 2023, Nerush's counsel circulated draft language attempting to merge these alternatives.[25] He proposed that Gortikov "be treated as a creditor" and that Gortikov's payments be considered "interest and principal" rather than capital contributions.[26] Gortikov rejected the proposed changes and refused to recharacterize his equity investment as debt.[27] Nerush's counsel withdrew the recommendation.[28]

Before closing, Gortikov raised capital from 19 investors to fund GC Broadway's investment.[29] No single investor contributed a majority of the funds.[30] The first $1 million was invested by the father of Greg Proniloff, a childhood friend of Gortikov who was then employed by WS.[31]

The transaction closed on January 19, 2023.[32] At closing, GC Broadway was deemed to have invested an initial $10.5 million, a portion of which was held in

---

[25] JX 108.

[26] *Id.*; *see* PTO ¶ 20.

[27] PTO ¶ 21.

[28] *Id.*

[29] *Id.* ¶ 22.

[30] *Id.*

[31] *Id.* ¶¶ 7, 22; Gortikov Tr. 95-97. Greg Proniloff owned an 18% economic interest in WS. He was employed by WS at the time the transaction closed but ceased to be affiliated with WS by mid-2023. PTO ¶ 7.

[32] PTO ¶ 23.

reserves.[33]   From these funds, $4,993,806 was wired to Nerush's personal bank account.[34]   Gortikov also paid Greg Proniloff a $21,000 voluntary referral fee from the commission Gortikov's entity received.[35]

### C.    The LLC Agreement

Also on January 19, the parties executed an Amended and Restated Limited Liability Company Agreement for the Company (the "LLC Agreement").[36]   By its terms, defendant AN SM 1925 Broadway Holdings, LLC—an entity owned and managed by Nerush—was labeled the "Sponsor Member" (or "Sponsor") and GC Broadway was labeled the "Investor Member" (or "Investor").[37]   The Sponsor was designated the Company's initial "Managing Member" and the sole common member; the Investor was the sole preferred equity member.[38]   The Investor and Sponsor "constitute[d] all of the Members of the Company."[39]

---

[33] *Id.*; Nerush Tr. 449.  Nerush invested the money received into a separate project called Cloverfield, another building also located in Santa Monica.  Nerush Tr. at 496-97.

[34] PTO ¶ 23; Gortikov Tr. 64.

[35] Gortikov Tr. 98; PTO ¶ 36.  Gortikov made the payment through Gortikov Investments, Inc.  It was made as a "voluntary referral fee from [Gortikov's] brokerage entity[,]" paid out from the commission it was entitled to under the LLC Agreement.  Gortikov Tr. 98.

[36] JX 125 ("LLC Agreement").

[37] *Id.* at 1; *see* PTO ¶¶ 6, 24.

[38] LLC Agreement 1; PTO ¶ 24.

[39] LLC Agreement § 1.2; PTO ¶ 25.

The LLC Agreement granted the Sponsor broad authority to "manage and conduct the operations and related contractual, financial and other affairs" and "make all decisions regarding the Company."[40] This authority had limits. For one, the Sponsor could not unilaterally approve any "Major Decision" without the Investor's written consent.[41] The agreement defined "Major Decision[s]" to include entering transactions with an affiliate of the Sponsor and leasing any portion of the Property.[42]

Central to the parties' economic arrangement was a "Redemption" mechanism. The LLC Agreement required the Sponsor to "cause the Company" to redeem the Investor's entire membership interest by paying the "Full Redemption Price" on or before the "Redemption Date."[43] The agreement set the Redemption Date as the earliest of several events: the sale or refinancing of the Property, the

---

[40] LLC Agreement §§ 5.1(a), 5.5.

[41] *Id.* § 5.3(f).

[42] *Id.* at Ex. B (o); *id.* at (s) (defining "Major Decision[s]" to include "any leasing of the Project"). The "Project" is defined as "the renovation and development of the Property," as determined by the context. *Id.* at Ex. A-13.

[43] *Id.* §§ 4.1-4.2. "Membership Interest" is defined as the "interest of a Member in the Company," including its right to share in the Company's assets or property. *Id.* at Exs. A-9, A-10. "Full Redemption Price" is defined as the sum of various factors, including all accrued and outstanding interest on loans, principal, preferred returns, and others. *Id.* § 4.1(e)(1).

removal of the Sponsor as Managing Member, or the fixed maturity date of the seller's loan on July 31, 2024.[44]

Nerush executed the LLC Agreement in both his representative capacity for the Sponsor and his individual capacity.[45] At trial, he admitted he did not read the LLC Agreement before signing it.[46]

### D. The Guaranties and Ancillary Agreements

Concurrent with the LLC Agreement, the parties executed several ancillary documents. Each described the transaction as an equity investment. An Amended and Restated Tenants in Common Agreement between the Company and 1925 Broadway characterized GC Broadway's contribution as a "preferred capital investment."[47] A separate Recognition Agreement between GC Broadway, the Sponsor, 1925 Broadway, and the Company likewise described GC Broadway's "Preferred Equity Investment."[48]

To secure the investment, Nerush executed two personal guaranties. First, under a "Payment Guaranty," Nerush "irrevocably and unconditionally guarantee[d]" to GC Broadway "the payment and performance of the Guaranteed

---

[44] *Id.* at Exs. A-13, A-14.

[45] PTO ¶ 29.

[46] Nerush Tr. 482; *see* PTO ¶ 29.

[47] JX 126; PTO ¶ 31.

[48] JX 127; *see* PTO ¶¶ 32-33. The Seller was also a signatory to the Recognition Agreement. *Id.* ¶ 32; *see also id.* ¶ 14.

Obligations" when due, including the "punctual payment . . . of the Full Redemption Price."[49]  Second, under a Guaranty of Recourse Obligations (the "Recourse Guaranty"), Nerush agreed to be personally liable for the Full Redemption Price upon a "Full Recourse Event."[50]  The Recourse Guaranty also made Nerush liable for "Recourse Liabilities," including for "fraud, intentional misrepresentation, or willful misconduct" and the "misappropriation" of any "Rents."[51]

As with the LLC Agreement, Nerush admitted at trial that he did not read any of these ancillary agreements before signing them.[52]

### E.  The Unauthorized Lease

After the execution of the LLC Agreement, Gortikov discovered that Nerush had leased the existing commercial building on the Property to Dandada, Inc. and Modern Aesthetica Corp. (the "Occupants").[53]  The Occupants operated a clinic providing elective medical enhancement services.[54]  Despite the lack of a formal

---

[49] JX 129 ("Payment Guaranty"); *see* JX 34.

[50] JX 128 ("Recourse Guaranty") § 1.2.

[51] *Id.*; *see infra* note 323.

[52] Nerush Tr. 483; *see* PTO ¶¶ 31-32, 34-35.

[53] PTO ¶ 38; Nerush Tr. 503-04.

[54] Nerush Tr. 504 ("Modern Aesthetica provided aesthetics for women, and Dandada operated doing male enhancement.").

lease agreement, the Occupants paid Nerush $20,000 per month in rent for use of the premises.[55]

This tenancy stood in direct contravention of Section 6.1(c)(E) of the LLC Agreement.[56] In that provision, the Sponsor represented that there were "no leases, tenancies, [or] rental agreements" affecting the Property.[57] The vacancy of the Property was material to the Investor's business plan, which contemplated immediate demolition to facilitate redevelopment.[58]

Despite this representation, on January 18, 2023—one day before signing the LLC Agreement—Nerush emailed Adam Shekter, a representative of the Property's 10% Owner, that: "The medical space will be used by me."[59] Consistent with that email, Nerush permitted Modern Aesthetica to occupy the site.

---

[55] *See* PTO ¶ 39; JX 149 (checks from Modern Aesthetica to Nerush); *see also* Moghadam Dep. 37-38.

[56] PTO ¶ 42.

[57] LLC Agreement § 6.1(c)(E).

[58] *See* Gortikov Tr. 72-76 (explaining that vacancy was critical to obtain demolition permits and mitigate historic preservation risks); Walter Dep. 82-85.

[59] JX 119; *see* Nerush Tr. 459-61; *see also id.* at 551 (identifying Adam Shekhter as the person who had the keys); *id.* at 493-94 (identifying Neil Shekhter's children as involved in the transaction). The Shekhters are prominent real estate investors in California. *See* Gortikov Tr. 94-95, 102; JXs 2-3. Neil Shekhter is also Nerush's half-brother. Gortikov Tr. 95.

This arrangement was lucrative for Nerush. Between April 2023 and December 2024, Nerush collected $300,000 in rent from the Occupants.[60] Nerush deposited these funds into the bank account of a personal entity, AN Properties, Inc.[61]

To resolve the unauthorized occupancy, the Occupants and their principal signed an Agreement to Vacate on November 20, 2023.[62] That agreement acknowledged that Modern Aesthetica and Dandada were occupying the building on the Property.[63] It set a "Vacation Date" of September 30, 2024, by which the Occupants were required to surrender possession.[64] They failed to do so.[65]

## F. The LLC Agreement Amendments

After Gortikov's discovery of the unauthorized lease, the parties twice amended the LLC Agreement to address delays in the project's timeline.

---

[60] Nerush Tr. 456-58 (confirming receipt of $20,000 monthly rent); Moghadam Dep. 106 (confirming checks totaling $300,000 were provided).

[61] Nerush Tr. 456-58 (admitting rent was deposited into an AN Properties account and not a Company account).

[62] JX 180. The Company, 1925 Broadway, the Investor, and Nerush were also parties to the agreement. PTO ¶ 43.

[63] PTO ¶ 44.

[64] JX 180; PTO ¶¶ 44-45. In the lead-up to the Vacation Date, Nerush also permitted other parties to occupy portions of the Property. PTO ¶ 46.

[65] *See* Gortikov Tr. 118; Moghadam Dep. 81.

On May 22, 2024, the Sponsor and Investor executed the First Amendment to the LLC Agreement, which granted the Sponsor an option to extend the Redemption Date to August 31, 2024.[66] It also expanded the definition of "Removal Event" to include a default of the Agreement to Vacate.[67] Significantly, the First Amendment stipulated that the Investor's "outstanding capital contributions" remained at $10.5 million.[68] Nerush signed the First Amendment on behalf of the Sponsor and himself without reading it.[69]

On August 30, 2024, the Sponsor and Investor executed the Second Amendment to the LLC Agreement, extending the Redemption Date to September 30, 2024.[70] This amendment included waivers and ratifications. The Sponsor and Nerush acknowledged that the Investor was "not in default under the LLC Agreement[,]" that they had "no set-offs, counterclaims, claims, defenses or other causes of action against Investor [] arising out of the preferred equity investment[,]" and that the Investor's then "outstanding capital contributions" stood at $9,737,064.99.[71] They also agreed that any default under the Agreement to Vacate

---

[66] JX 193 §§ 2(c), 2(e), 3.

[67] *Id.* § 2(e); PTO ¶ 48.

[68] PTO ¶ 48.

[69] *Id.* ¶ 49.

[70] JX 219; PTO ¶ 50.

[71] JX 219 § 4; PTO ¶ 51.

13

or the Second Amendment itself would constitute an immediate Removal Event.[72] Nerush signed the Second Amendment on behalf of himself and the Sponsor, again without reading the contract.[73]

### G. The Redemption and Vacation Defaults

The September 30, 2024 Redemption Date passed without performance.[74] The Company failed to redeem the Investor's membership interest or pay any portion of the Full Redemption Price as required by the LLC Agreement.[75] Nor did Nerush pay the Investor anything on or before that date, as required by the Payment Guaranty.[76]

Additionally, the Occupants failed to vacate the Property, maintaining possession beyond the contractually mandated Vacation Date.[77] Nerush has permitted the Occupants to ignore the Investor's eviction efforts and continue occupying the premises.[78]

---

[72] JX 219 § 2(e); PTO ¶ 51.

[73] PTO ¶ 52.

[74] *Id.* ¶ 53.

[75] *Id.* ¶¶ 54-55.

[76] *Id.* ¶ 55.

[77] *Id.* ¶ 56.

[78] Gortikov Tr. 117-18; Moghadam Dep. 81-82.

## H. The California Action

Also on the September 30 Redemption Date, Nerush and the Sponsor filed a lawsuit in California ("California Action") against GC Broadway and Gortikov.[79] Purportedly acting on the Company's behalf, they claimed that the Investor's preferred equity investment was a disguised debt instrument.[80] Based on this characterization, they alleged that the effective interest rate of the purported debt violated Article XV of the California Constitution, which generally caps interest on loans at 10%.[81]

On October 22, 2024, the Company and Nerush amended their California complaint to name the Property's 10% Owner (1925 Broadway) as a defendant and to add claims for quiet title and partition.[82] The same day, Nerush recorded a *lis pendens* against the Property, effectively clouding its title.[83] The California court expunged the *lis pendens* in March 2025 and awarded attorneys' fees to the 10% Owner, Gortikov, and GC Broadway.[84]

---

[79] JX 225.

[80] *Id.*; PTO ¶ 58.

[81] PTO ¶ 58; *see* Calif. Const. art. XV, § 1.

[82] JX 237.

[83] PTO ¶ 60.

[84] *Id.* ¶ 61.

The California Action was voluntarily dismissed in June 2025.[85]  The dismissal followed the plaintiffs' motion in this court to enjoin the defendants from prosecuting the California Action.[86]

## I.    This Litigation

GC Broadway and Gortikov filed this action against the Sponsor and Nerush in October 2024.[87]  The operative amended complaint was filed in July 2025.[88]  The plaintiffs advance claims for declaratory judgment (Count I), breach of contract (Count II), breach of guaranty (Count III), and fraud (Count IV).[89]

Proceedings were briefly stalled by the defendants' litigation tactics.  In December 2024, the Sponsor filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, triggering an automatic stay.[90]  In January 2025, the bankruptcy court lifted the stay and allowed this action to proceed.[91]

---

[85] *Id.* ¶ 62; *see* Dkts. 4-5, 119, 178-80.

[86] PTO ¶ 62; *see also* Mot. for Partial Summ. J. (Dkt. 4).

[87] Verified Compl. (Dkt. 1).

[88] First Am. Verified Compl. (Dkt. 185) ("Am. Compl.").

[89] *Id.* ¶¶ 70-105.

[90] Suggestion of Bankr. (Dkt. 54).

[91] Letter Regarding Lifting Stay and Requesting Scheduling Teleconference (Dkt. 56); *id.* at Ex. A (Order from Bankr. D. Del. Granting Mot. for Relief from Automatic Stay to Resume Del. Ct. Ch. Proceedings); *see also* Minute Order (Dkt. 58).  After the stay was lifted, the plaintiffs filed their amended complaint.  Dkt. 60.

On June 9, 2025, this court granted partial summary judgment for the plaintiffs on Count I and entered an order confirming the Sponsor's removal and the Investor's installation as the Company's Managing Member.[92] It was undisputed that a "Removal Event" had occurred as defined in the LLC Agreement, and that the Investor had served two removal notices to which the Sponsor did not respond.[93] Although the merits of Counts I and II regarding control of the Company were resolved, the question of any damages for those counts remains to be decided.[94]

On July 18, 2025, the defendants filed a counterclaim against GC Broadway and Gortikov.[95] They advance claims for fraudulent concealment (Counterclaim I), breach of contract (Counterclaim II), and fraud (Counterclaim III).[96] The defendants also seek a declaratory judgment that Gortikov's "preferred return" is a usurious loan governed by California law (Counterclaim VI) and assert corresponding direct and derivative usury claims (Counterclaims IV and V).[97]

A three-day trial was held beginning on October 15, 2025 to resolve the remaining claims, including the enforcement of the Payment Guaranty and the

---

[92] PTO ¶ 67.

[93] *Id.* ¶¶ 64-66.

[94] *Id.* at 2.

[95] Countercl. (Dkt. 184).

[96] *Id.* ¶¶ 21-42.

[97] *Id.* ¶¶ 43-56.

defendants' counterclaims.[98]   After post-trial briefing concluded on December 5, 2025, I determined that post-trial argument was unnecessary and took the matter under advisement.[99]

## II.   LEGAL ANALYSIS

The parties proceeded to trial on the plaintiffs' claims for breach of the Payment Guaranty (Count III) and fraud (Count IV).[100]   Also tried were the defendants' counterclaims for fraudulent concealment (Counterclaim I), breach of contract (Counterclaim II), fraud (Counterclaim III), and usury (Counterclaims IV, V, and VI).[101]   After trial, the defendants moved to amend their pleading to add additional counterclaims.[102]

The burden of proof on these claims is a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not."[103]   Under this standard, "certain evidence, when compared to the evidence

---

[98] Dkt. 271; *see* Dkts. 288-90 (Trial Trs.).

[99] Pls.' Post-trial Opening Br. (Dkt. 279); Defs.' Opening Post-trial Br. (Dkt. 281); Pls.' Post-trial Answering Br. (Dkt. 284); Defs.' Post-trial Closing Br. (Dkt. 285).

[100] PTO 2-3; Dkt. 173 (Order).

[101] Countercl. ¶¶ 21-56; PTO 3-6.

[102] *See infra* Section II.B.1.

[103] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[104]

I begin by addressing the plaintiffs' affirmative claims for breach of the Payment Guaranty and fraud. I then turn to the defendants' counterclaims and affirmative defenses, including their contention that the transaction was a usurious loan and their various theories of fraud and breach of contract. I conclude by assessing damages.

## A. The Plaintiffs' Affirmative Claims

The plaintiffs pressed two primary claims at trial. First, they seek to enforce the Payment Guaranty against Nerush for his failure to pay the Full Redemption Price (Count III).[105] Second, they allege that Nerush committed fraud by misrepresenting his intention to keep the Property vacant (Count IV).[106]

The plaintiffs have met their burden on Count III. The evidence establishes that Nerush executed an absolute and unconditional guaranty, the payment deadline passed without performance, and no valid defense excuses his breach. The plaintiffs also proved Count IV. The trial record demonstrates that Nerush made a knowing

---

[104] *Id.*

[105] Am. Compl. ¶¶ 91-97.

[106] *Id.* ¶¶ 98-105.

misrepresentation regarding the occupancy of the Property to induce the Investor's participation, resulting in a harm distinct from the contractual non-payment.

### 1. The Payment Guaranty (Count III)

"Delaware adheres to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party."[107] "When interpreting a contract, the [c]ourt will give priority to the parties' intentions as reflected in the four corners of the agreement[.]"[108] The court assesses the contract "as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[109]

The plaintiffs seek to enforce Section 1.2 of the Payment Guaranty, which makes Nerush personally liable for the Company's failure to redeem the Investor's interest:

> Guarantor hereby assumes liability for, hereby agrees to pay, and hereby guarantees the punctual payment to Investor, and not merely the collectability, of the Full Redemption Price . . . .[110]

---

[107] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[108] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[109] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010)).

[110] Payment Guaranty § 1.2.

A guaranty is a contract.[111]  To prevail, the plaintiffs must demonstrate: "(1) the existence of a contract; (2) the breach of a contractual obligation; and (3) resulting damages."[112]  The record establishes all three elements.

First, the Payment Guaranty is a valid and enforceable contract governed by Delaware law.[113]  Nerush executed the Payment Guaranty on January 19, 2023.[114]  He admits that he did not read the contract before signing it.[115]  His failure to read the document before execution does not excuse his performance.[116]

Second, the plaintiffs proved a breach of the contractual obligation.  A guarantor's liability arises upon the principal obligor's default.[117]  The LLC Agreement required the Company to pay the Full Redemption Price by the

---

[111] *FinanceAmerica Priv. Brands, Inc. v. Harvey E. Hall, Inc.*, 380 A.2d 1377, 1379 (Del. Super. 1977) (explaining that a "guaranty is a . . . contract").

[112] *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *9 (Del. Ch. June 11, 2020).

[113] Payment Guaranty § 5.3(a) (providing that the Guaranty "shall be interpreted and enforced according to the laws of the State of Delaware").

[114] PTO ¶ 34; Nerush Tr. 465.

[115] PTO ¶ 34.

[116] *See Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991) (holding that a party who signs a contract is bound by its terms regardless of whether they read it); *REM OA Hldgs., LLC v. N. Gold Hldgs., LLC*, 2023 WL 6143042, at *20 (Del. Ch. Sept. 20, 2023) ("Avoidance is not justified by a party's failure to read a contract[.]" (citation omitted)), *aff'd*, 320 A.3d 237 (Del. 2024) (TABLE).

[117] *See Anguilla Re, LLC v. Lubert-Adler Real Est. Fund IV, L.P.*, 2012 WL 1408857, at *4 (Del. Super. Mar. 28, 2012) ("A contract of guaranty is a promise or undertaking that is collateral to a principal obligation.  The guarantor is bound to perform in the event that the principal obligor defaults.").

September 30, 2024 Redemption Date.[118] The parties stipulated that "[t]he Company did not pay Investor the Full Redemption Price" by that date.[119]

The Company's primary default triggered Nerush's secondary obligation.[120] Section 1.2 of the Payment Guaranty required Nerush's "punctual payment" to the Investor of the Full Redemption Price upon the Company's default.[121] Nerush breached the Payment Guaranty by failing to satisfy that obligation.[122] He conceded at trial that he never paid the Full Redemption Price to the Investor.[123]

Third, this breach caused damages. As a result of the Company's default and Nerush's non-payment, the Investor has been deprived of its capital and its contractual return. The quantification of these damages is addressed in the Remedies section below.[124]

---

[118] LLC Agreement § 4.2(a).

[119] PTO ¶¶ 53-54.

[120] *See Anguilla*, 2012 WL 1408857, at *4.

[121] Payment Guaranty § 1.2.

[122] PTO ¶¶ 53-54.

[123] Nerush Tr. 465 ("Q: And you never paid the full redemption price. Correct? A: That is correct.").

[124] *See infra* Section III.A; *see also* JX 341; Pls.' Post-trial Opening Br. 30.

In defense of his breach, Nerush advances usury and fraud theories to argue that the contract is void. Those claims fail, as explained below.[125] Judgment on Count III is in the plaintiffs' favor.

### 2. Fraudulent Inducement (Count IV)

The plaintiffs press a fraud claim against Nerush based on his representations in the LLC Agreement about the Property. They assert that Nerush falsely represented that the Property was vacant and would remain so, while concealing his pre-existing intent to lease the premises to the Occupants.[126]

To prevail on a fraud claim, a plaintiff must prove:

> 1) a false representation, usually one of fact . . . ; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.[127]

To begin, the defendants insist this claim is an impermissible attempt to "bootstrap" a breach of contract claim into a tort claim. In their view, the claim hinges on the same factual predicate as a breach of contract—violation of the vacancy covenant in Section 6.1—and effectively seeks duplicative damages for a

---

[125] *See infra* Section II.B; *see also* Defs.' Post-trial Closing Br. 6.

[126] Pls.' Post-trial Opening Br. 30-33.

[127] *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).

contractual failure.[128]   Under Delaware law, a plaintiff cannot twist a breach of contract claim into a fraud claim "merely by alleging that a contracting party never intended to perform its obligations."[129]   But exceptions exist.   If a plaintiff can prove a defendant made a "putative misrepresentation" of "either a past or contemporaneous fact or a future event that falsely implies an existing fact" that induced the contract, a fraud claim may lie.[130]   The evidence at trial proves such a claim.

First, the Sponsor made a false representation of fact.   In Section 6.1(c)(E) of the LLC Agreement, the Sponsor represented that "[t]o the knowledge of Sponsor Member . . . there [we]re no leases, tenancies, [or] rental agreements" affecting the Property.[131]   The Sponsor further covenanted in Exhibit D-2 to the LLC Agreement that the Property was "vacant . . . and w[ould] be kept vacant permanently."[132]

---

[128] *See* Defs.' Pre-trial Br. 8-9 (arguing that "all [the p]laintiffs have is a breach of contract claim" because there is "no evidence of . . . a pre-existing intent not to perform").

[129] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010) (citing *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998)).

[130] *See Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *7 (Del. Ch. Dec. 23, 2008) ("An unfulfilled promise of future performance will . . . convert a potential contract claim into a claim sounding in fraud . . . [if] at the time the promise was made the speaker had no intention of performing."); *Carrow v. Arnold*, 2006 WL 3289582, at *8 (Del. Ch. Oct. 31, 2006) ("[A] viable claim of fraud concerning a contract must allege misrepresentations of present facts . . . that were collateral to the contract and which induced the allegedly defrauded party to enter into the contract." (citation omitted)).

[131] LLC Agreement § 6.1(c)(E).

[132] *Id.* at Ex. D-2.

Second, Nerush knew this representation was false when he caused the Sponsor to make it. As the manager and sole member of the Sponsor, Nerush's knowledge is imputed to the entity.[133] On January 18, 2023—one day before signing the LLC Agreement—Nerush emailed Adam Shekhter to say that the "medical space" on the Property would be "used by [Nerush]."[134] This email confirmed that while Nerush was warranting vacancy to the Investor, he had an undisclosed plan to occupy the Property with Modern Aesthetica.[135] This is not a mere failure to perform a future promise. It is a knowing misrepresentation of present intent.[136]

Third, the plaintiffs justifiably relied on this representation. The vacancy of the Property was material to the Investor's business plan, which required immediate demolition for redevelopment.[137] Gortikov credibly testified that had he known of the unauthorized tenancy, he would not have closed the transaction or would at least

---

[133] *See Triton Constr. Co. v. E. Shore Elec. Servs.*, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009) (imputing the knowledge of a "controlling officer" to the entity); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.").

[134] JX 119; Nerush Tr. 459-61.

[135] *See* Nerush Tr. 503-04.

[136] *See MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010) (finding scienter adequately pled where defendant allegedly negotiated a deal while secretly planning to violate it).

[137] Gortikov Tr. 72-76.

25

have required different security.[138] The integration clause in Section 16.2 of the LLC Agreement does not bar this claim, as the fraudulent representation is contained within the contract itself and the agreement lacks an anti-reliance provision disclaiming such representations.[139]

Fourth, the plaintiffs suffered distinct damages. The fraud induced the Investor to forgo a second deed of trust, leaving it exposed when Nerush later defaulted. The unauthorized tenancy also delayed the redevelopment timeline and forced the Investor to incur costs to regain possession of the Property. Although the non-payment of the redemption price is addressed in Count III, damages flowing from the vacancy fraud—eviction costs and lost time—are recoverable under Count IV, as addressed below.[140]

Accordingly, judgment is entered for the plaintiffs on Count IV. As the Sponsor's manager, Nerush's personal participation in the commission of the fraud subjects him to personal liability.[141]

---

[138] *Id.* at 72.

[139] LLC Agreement § 16.2; *see Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006) (holding that a standard integration clause does not bar fraud claims based on written contractual representations).

[140] *See infra* Section III.

[141] *See Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch. Apr. 20, 2009) ("[A] corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant." (citation omitted)).

## B.    The Defendants' Counterclaims and Defenses

The defendants pleaded six counterclaims against the plaintiffs, all of which seek to invalidate the Payment Guaranty or offset the damages owed. Those counterclaims are for fraudulent concealment (Counterclaim I), breach of contract (Counterclaim II), fraud (Counterclaim III), and usury (Counterclaims IV and V).[142] The defendants/counterclaim plaintiffs also seek a declaratory judgment that Gortikov's "Preferred Return" is a usurious loan governed by California law (Counterclaim VI).[143] After trial, the defendants moved to amend their pleadings to assert three additional counterclaims (Counterclaims VII, VIII, and IX) to conform to the trial evidence.[144] For the reasons explained below, the counterclaims fail.

### 1.    Procedural Framework

Before addressing the merits of the counterclaims, I pause to address the procedural posture. In August 2025, the plaintiffs moved to dismiss Counterclaims IV, V, and VI.[145] Briefing ensued, and I deferred ruling on the motion until after

---

[142] Countercl. (Dkt. 184).

[143] *Id.* ¶¶ 53-56.

[144] *See infra* note 147 and accompanying text.

[145] Opening Br. in Supp. of Countercl. Defs.' Mot. for Partial Dismissal of Counts IV, V and VI, and for Punitive Damages (Dkt. 189).

trial.[146] The plaintiffs/counterclaim defendants answered Counterclaims I, II, and III.[147]

After trial, the defendants moved to amend their pleading to add three counterclaims to conform to the evidence.[148] The counterclaims they seek to add are: fraudulent concealment (Counterclaim VII); "affirmative fraud" (Counterclaim VIII) regarding the allegation that the plaintiffs had not raised $10.5 million at closing; and breach of the implied covenant of good faith and fair dealing (Counterclaim IX) regarding a referral fee paid to Greg Proniloff.[149]

Under Court of Chancery Rule 15(b), "[w]hen an issue not raised by the pleadings is tried with the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."[150] The purpose of this rule is "to encourage the disposition of litigation on its merits" rather than on procedural technicalities.[151] Although "Rule 15 provides in effect that amendments of the pleadings are to be

---

[146] Letter to Counsel Regarding Mot. to Dismiss (Dkt. 262); *see also* Countercls.' Opp'n to Countercl. Defs.' Mot. for Partial Dismissal (Dkt. 206) ("MTD Countercl.' Opp'n"); Reply Br. in Supp. of Countercl. Defs.' Mot. for Partial Dismissal (Dkt. 212).

[147] Countercl. Defs.' Answer to Countercl. and Aff. Defenses (Dkt. 269).

[148] Defs.' Mot. to Amend Pursuant to Rule 15(b) (Dkt. 278) ("Defs.' Mot. to Amend").

[149] *Id.* ¶ 1.

[150] Ct. Ch. R. 15(b)(2).

[151] *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 759 (Del. Ch. 2014) (citation omitted).

28

freely granted, it remains a discretionary matter for the judge."[152]  I exercise that discretion here to grant the Rule 15(b) motion as to Counterclaims VII and VIII, and to deny it as to Counterclaim IX.

Two factors dictate this result: (1) whether consent—express or implied—was given;[153] and (2) whether prejudice will result from granting the motion.[154]  Consent is necessary for a Rule 15(b) motion to be granted.[155]  But it is not necessarily sufficient, since courts must also consider the existence of prejudice.[156]

---

[152] *Laird v. Buckley*, 539 A.2d 1076, 1079 (Del. 1988); *Vichi*, 85 A.3d at 759 (noting that the "decision to permit or deny an amendment is left to the discretion of the trial judge" (citation omitted)).

[153] Ct. Ch. R. 15(b).

[154] *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs.*, 2008 WL 2133417, at *10 (Del. Ch. May 21, 2008); *Bellanca Corp. v. Bellanca*, 169 A.2d 620, 622 (Del. 1961) ("A trial judge in his discretion must always permit or deny the amendment by weighing the desirability of ending the litigation on its merits against possible prejudice or surprise to the other side.").

[155] *Lloyd's*, 2008 WL 2133417, at *9 ("Under the relevant part of Rule 15(b), *the parties must consent*, explicitly or implicitly, to the introduction of evidence of the unpleaded issue." (emphasis added)).

[156] 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Practice and Procedure* § 1493 (2008) ("Rule 15(b)(2) does not expressly refer to prejudice as a basis for denying an amendment to conform to issues that have been introduced without objection; it only speaks of consent.  Nonetheless, consideration of this factor is a valid exercise of the court's discretion."); *Lloyd's*, 2008 WL 2133417, at *7 n.59 (explaining that Rule 15 is modeled on Rule 15 of the Federal Rules of Civil Procedure, and that "Delaware courts routinely look to the federal courts' application of" the federal rule for guidance).

29

It is undisputed that the plaintiffs did not expressly consent to the amendment.[157] But their conduct at trial shows implied consent to the introduction of two of the three proposed counterclaims. Implied consent involves "whether the parties recognized that an issue not presented by the pleadings entered the case at trial."[158] Here, the parties fully litigated the factual and legal basis for Counterclaims VII and VIII concerning funding.[159] Because the plaintiffs engaged with this distinct factual dispute at trial, they "understood that the [admission of such] evidence was aimed at the unpleaded issue."[160]

At the same time, the plaintiffs did not give implied consent for Counterclaim IX. Implied consent "should not be inferred when 'evidence relevant to a properly pleaded issue also incidentally tends to prove [a] fact not pleaded.'"[161] Evidence regarding the payment to Proniloff, which forms the basis of Counterclaim IX, was

---

[157] PTO ¶ 71 (expressing an intention to "oppose . . . an amendment" under Rule 15(b)); Trial Tr. Vol III (Dkt. 290) 609-10 (same); Pls.' Post-trial Opening Br. 51-61 (same).

[158] *Lloyd's*, 2008 WL 2133417, at *9.

[159] *See, e.g.*, Gortikov Tr. 279-30 (discussing the funds raised at the time of closing, pertinent to Counterclaim Counts VII and VIII); *id.* at 352-53 (same); *see also* LLC Agreement § 2.2 (same).

[160] *State ex rel. Structa-bond, Inc. v. Mumford & Miller Concrete, Inc.*, 2002 WL 31101938, at *3 (Del. Super. Sept. 17, 2002).

[161] *Vichi*, 85 A.3d at 761 (citation omitted); Pls.' Post-trial Opening Br. 54-55.

already relevant to the existing Counterclaims I, II, and III.[162]  Because this evidence was admissible for the pleaded claims, the plaintiffs had no reason to object to its introduction.  Their failure to do so cannot be construed as implied consent to try a newly minted claim for breach of the implied covenant of good faith and fair dealing.[163]

That leaves the issue of prejudice for the claims where consent exists.[164]  Where consent is given, prejudice will vitiate a claim if the opposing party was denied a "fair opportunity" to defend against the new theory or offer evidence in response.[165]  This requirement prevents unfair "surprise to the other side."[166]

---

[162] *See* Defs.' Mot. to Amend, Ex. B (First Am. Countercl.) ¶¶ 84-90; *see also* Gortikov Tr. 98-100 (explaining the nature of a $21,000 payment to Proniloff, relevant to Counterclaim Count IX and the preexisting Counterclaim Counts I-III).

[163] Even if consent were given, this claim would still fail on the merits.  The implied covenant is a gap-filling mechanism that applies only when a contract is silent on a disputed issue.  *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).  It is a "cautious enterprise" and cannot be used to "override the express terms of [a] contract."  *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).  The LLC Agreement at issue here is not silent, however.  Section 6.3 governs the subject of broker commissions and defines the scope of prohibition, limiting it to parties "entitled" to compensation.  LLC Agreement § 6.3; *see infra* notes 217-229 and accompanying text (explaining why the defendants' counterclaim for breach of Section 6.3 fails).

[164] *Lloyd's*, 2008 WL 2133417, at *10.

[165] *Id.*

[166] *Bellanca*, 169 A.2d at 622.

I see no meaningful prejudice to the plaintiffs from the addition of Counterclaims VII and VIII.[167] The relevant issue—whether Gortikov was required to disclose the funding available at closing—was pressed throughout trial.[168] This discrete issue did not require additional discovery or expand the scope of the trial.[169] It also did not cause a "change of tactics or theories" on either side.[170]

Thus, the operative pleading is deemed amended to include Counterclaims VII and VIII. The Rule 15(b) motion is, however, denied as to Counterclaim IX.

As for the pending motion to dismiss Counterclaims IV, V, and VI, it is denied as moot. Because the parties have tried these claims, the sufficiency of the pleadings is no longer the operative inquiry.[171] I proceed to resolve the counterclaims on the merits.

---

[167] I need not reach the issue of prejudice as to Counterclaim IX, because the plaintiffs did not give express or implied consent to try this claim.

[168] *See, e.g.*, Gortikov Tr. 279-30 (discussing the funds raised at the time of closing, pertinent to Counterclaim Counts VII and VIII); *id.* at 352-53 (same); LLC Agreement § 2.2 (same).

[169] *Bellanca*, 169 A.2d at 622 (stating that, where "no additional evidence" is offered, "there can be . . . no possible prejudice" for purposes of a Rule 15(b) analysis).

[170] *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *41 (Del. Ch. May 19, 2020) (citation omitted).

[171] *Bellanca*, 169 A.2d at 622 (explaining that, under Rule 15, "pleadings are not an end in themselves" and should "assist, not deter, the disposition of litigation on its merits").

2. <u>Usury (Counterclaims IV, V, and VI)</u>

In Counterclaims IV, V, and VI, the defendants/counterclaim plaintiffs ask this court to disregard the plain terms of the parties' agreements, recharacterize the Investor's capital contribution as a loan, and declare the "Preferred Return" usurious under California law. Counterclaim VI seeks a declaration that the Investor's contribution is a "disguised loan."[172] Counterclaims IV and V concern whether this purported "loan" violates Article XV of the California Constitution, which generally caps interest rates at 10%.[173]

These claims fail for three reasons. First, Delaware law governs the interpretation of the LLC Agreement. Second, the economic reality of the transaction confirms it is an equity investment. And third, the defendants are contractually and equitably estopped from recharacterizing the transaction they intentionally structured as equity to secure tax benefits.

a. Choice of Law

The defendants insist that California law—rather than Delaware law—should apply to the determination of whether Gortikov's investment is debt or equity.[174] They note that Nerush is a California resident, GC Broadway is a California entity,

---

[172] PTO 5; Countercl. ¶ 45.

[173] Countercl. ¶¶ 43-52.

[174] PTO 5-6.

the place of negotiation and contracting was California, and the contract itself concerns property located in California.[175] They also highlight that the California Constitution bans interest rates for debt instruments in excess of 10%, while Delaware has no analogous law.[176] This request is rejected.

The LLC Agreement mandates the application of Delaware law. Section 16.5 states that "[t]his Agreement and the rights of the Parties shall be governed by, and interpreted and enforced in accordance with, the internal laws of the State of Delaware without regard to principles of conflicts of laws."[177] Section 1.2 further confirms that the "rights and obligations" of the Company's members "shall be governed by the provisions of the Delaware [Limited Liability Company] Act."[178]

"Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."[179] Here, the relationship is indisputable. The plaintiffs are

---

[175] MTD Countercl.' Opp'n 8.

[176] *Id.* at 4-6.

[177] LLC Agreement § 16.5. Section 5.3 of the Payment Guaranty also states that Delaware substantive law governs the document. Payment Guaranty § 5.3.

[178] LLC Agreement § 1.2; *see also id.* at Ex. A.

[179] *J.S. Alberici Constr. Co. v. Mid- W. Conveyor, Co.*, 750 A.2d 518, 520 (Del. 2000); *see also Ashall Homes Ltd. v. ROK Ent. Gp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010).

enforcing rights to a preferred return arising under the Company's LLC Agreement.[180]

Under the Restatement (Second) of Conflicts of Laws, which Delaware follows, a choice of law provision will be enforced in the event of a conflict, unless doing so would violate a "fundamental public policy" of a state with a "materially greater interest" than Delaware.[181] The defendants cannot satisfy this test.

First, no conflict exists between California's and Delaware's laws on recharacterization of debt and equity. California courts are "bound to consider substance over form . . . to ascertain [the parties'] true intent" when evaluating the character of an instrument.[182] Delaware abides by the same principle.[183] The result would be the same regardless of which state's laws—California or Delaware—applied.

---

[180] PTO ¶ 4.

[181] *NuVasive, Inc. v. Miles*, 2018 WL 4677607, at *3, *5 (Del. Ch. Sept. 28, 2018) (citing *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *2, *3 (Del. Ch. Jan. 28, 2015)).

[182] *In re Marriage of Umphrey*, 218 Cal. App. 3d 647, 657 (Cal. Ct. App. 1990); *see also People v. Sidwell*, 27 Cal. 2d 121, 128 (Cal. 1945) ("[T]he substance and not the mere form of a transaction determines its character.").

[183] *Monroe Park v. Metro. Life Ins.*, 457 A.2d 734, 737 (Del. 1983) (explaining that "equity regards substance rather than form"); *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) (citing *Moore v. Am. Fin. & Secs. Co.*, 73 A.2d 47 (Del. Ch. 1950) to stand for the proposition that, where "ambiguity" exists as to the nature of an instrument, courts look to various substantive factors beyond "the terms of [a] contract").

Second, California does not have a materially greater interest in this matter than Delaware. This dispute concerns the internal affairs of a Delaware limited liability company—specifically, the classification of a member's capital contribution as debt or equity.[184] The core issue is the definition of a membership interest under a limited liability company agreement. To that end, "[a] claim to enforce [an] entity's constitutive document necessarily implicates the special interest that a sovereign has in adjudicating cases involving the internal affairs of entities created under its laws."[185] Delaware has a paramount interest in providing certainty and uniformity over the internal governance and capital structure of entities created under its laws.[186]

Third, enforcing Delaware law does not violate a fundamental public policy of California. The defendants posit that applying Delaware law evades California's usury cap. But that argument assumes that the instrument is a loan; it is not.[187]

---

[184] *See NuVasive, Inc. v. Miles*, 2018 WL 4677607, at *3, *5 (Del. Ch. Sept. 28, 2018) (holding that California did not have a "materially greater interest" than Delaware where the parties were sophisticated and represented by counsel, despite California's strong public policy against non-competes).

[185] *Terramar Retail Ctrs., LLC v. Marion #2 Seaport Tr. U/A/D June 21, 2002*, 2017 WL 3575712, at *7 (Del. Ch. Aug. 18, 2017).

[186] *See VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del. 2005) (holding that the internal affairs doctrine is constitutionally mandated to ensure that "only one state [has] the authority to regulate a corporation's internal affairs" to avoid conflicting demands).

[187] *See infra* Section II.B.2.b.

Because California's usury laws apply only to "loan[s] or forbearance[s,]" characterizing an equity investment as such does not conflict with California policy.[188]

### b.    Equity or Debt

Under Delaware law, the characterization of an instrument as debt or equity starts with an "interpretation of the contract between the [entity] and [the] security holders."[189]    Courts should assess the "economic reality of the surrounding circumstances" and the "intent of the parties" to determine whether a label is a sham.[190]  Put differently, the court may consider the overarching question of whether "the parties called an instrument one thing when in fact they intended it as something else."[191]    Still, the inquiry centers on the substantive rights and obligations created by the instrument.  Here, the plain terms of the LLC Agreement create an equity interest, and the economic reality confirms that the parties intended that structure.

---

[188] *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798 (Cal. 1994).

[189] *Harbinger Cap. P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 229 (Del. Ch. 2006) (citation omitted).

[190] *In re SubMicron Sys. Corp.*, 432 F.3d 448, 456-57 (3d Cir. 2006) (applying Delaware law and explaining that the determination considers the "economic reality of the surrounding circumstances," and "facts that confer context case-by-case"); *see Nelson v. Emerson*, 2008 WL 1961150, at *4 n.13 (Del. Ch. May 6, 2008) ("Recharacterization of debt to equity looks at whether a debt is really an equity contribution disguised as a debt [and vice versa]."); *Wolfensohn*, 253 A.2d at 75 (holding that whether an instrument is debt or equity depends on the "terms of [the] contract" and intent of the parties).

[191] *SubMicron*, 432 F.3d at 455-56 (applying Delaware law).

First, the LLC Agreement unambiguously describes Gortikov's contribution as an equity investment.[192] The LLC Agreement refers to GC Broadway as the "Investor Member" and the contribution as a "Preferred Equity Investment."[193] Section 13.2 states that the investment would be treated as debt for tax purposes only to effectuate Nerush's 1031 exchange goals.[194] Notably, the LLC Agreement separately defines and describes a "Loan" from the seller, demonstrating that the parties knew how to create a debt instrument when they intended to.[195]

The LLC Agreement also confers rights characteristic of equity. The Investor holds "voting and decision rights" and veto power over "Major Decisions."[196] Such rights are the prerogatives of an owner with a stake in the enterprise's success rather than a passive lender.[197] Unlike a loan with a guaranteed repayment schedule, the

---

[192] *See Wolfensohn*, 253 A.2d at 75 (holding that "[t]he question of whether or not the holder of a particular instrument is a stockholder or a creditor depends upon the terms of his contract").

[193] LLC Agreement § 2.2 ("The amounts contributed by Investor Member hereunder shall sometimes be referred to as the 'Preferred Equity Investment.'"); *see also id.* §§ 2.2(b), 4.2(e); JX 219, Recitals.

[194] LLC Agreement § 13.2.

[195] *Id.* § 17.3; *see id.* at Ex. A-7; *see also In re Autostyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001) (noting that the existence of other outside lending suggests the instrument at issue is equity).

[196] LLC Agreement §§ 1.2, 5.3(f); *see id.* at Ex. B (defining "Major Decisions").

[197] *See Harbinger Cap.*, 906 A.2d at 231 (noting that even contingent voting rights are evidence of equity); *id.* at 231 n.56 (explaining that "the right to vote is necessarily a characteristic right of equity"); *In re Color Tile, Inc.*, 2000 WL 152129, at *5 (D. Del. Feb. 9, 2000) (same).

Investor's return is tied to the success of the "Project."[198]  The Investor's preferred return is subordinate to senior debt and paid only from available "Net Capital Proceeds" or "Available Cash."[199]  The fact that payment depends on the entity's business fortunes is consistent with an equity investment.[200]

Second, the economic reality defeats the defendants' belief that the transaction is a "disguised loan."[201]  Though the defendants ask me to prioritize substance over form, the substance confirms that the equity form was purposefully chosen.  The parties considered and rejected a loan structure in favor of equity to secure tax benefits for Nerush, not to disguise a loan.

The negotiation history is dispositive.  A November 2022 "Summary of Terms and Conditions" in the term sheet initially gave Gortikov the option to pursue an "Alternative Structure" for the "investment as a loan."[202]  Nerush's counsel then warned that a secured loan would "imperil" Nerush's Section 1031 exchange and advised proceeding with the "Investor membership" (i.e., equity) structure

---

[198] LLC Agreement §§ 2.2, 4.1(a)-(e).

[199] *Id.* § 4.1(a)-(e).

[200] *Compare SubMicron*, 432 F.3d at 455-56 (observing that the repayment of funds "based on the borrower's fortunes" is a hallmark of an equity investment), *with Autostyle Plastics*, 269 F.3d at 749-50 (stating the "[u]se of advances to meet the daily operating needs of the corporation . . . is indicative of bona fide indebtedness").

[201] Defs.' Opening Post-trial Br. 22.

[202] JX 13 at 5-6 (outlining an "Alternative Structure").

instead.[203]  Later, in an attempt to secure debt treatment within that structure, Nerush's counsel proposed drafting the agreement to deem the Investor's contribution "debt and not equity for all purposes."[204]  Gortikov rejected that proposal.[205]  The parties executed a final LLC Agreement treating the contribution as equity for all purposes, except tax reporting.[206]

The defendants' remaining arguments are unavailing.  The defendants insist that the mandatory redemption provision shows the contribution is a loan.[207]  But such provisions do not convert equity into debt because "the rights of shareholders to redeem shares are not guaranteed" and depend on the entity having available funds.[208]  Here, the Investor's right to redemption is constrained by certain conditions, distinguishing it from a fixed debt obligation.[209]  Nor does Gortikov's

---

[203] JX 88; *see also* JX 100 (email from Nerush's tax advisor, warning that a loan would make the Investor a "related person" and disqualify the 1031 exchange).

[204] JX 108 at 85 (draft LLC Agreement, Ex. A-3, defining "Capital Contributions" to be treated as "debt and not equity for all purposes"); *id.* at 15 (draft Section 4.1(a) proposing Investor "be treated as a creditor"); *see also* JX 88 (proposing that Investor "participate[] as a second trust deed lender" for purposes of "successful 1031 treatment").

[205] PTO ¶ 21.

[206] *See* LLC Agreement § 4.1(a); *id.* at Ex. A-3 (final agreement omitting the "debt" language).

[207] Defs.' Opening Post-trial Br. 25.

[208] *See Harbinger Cap.*, 906 A.2d at 225-27 (rejecting an argument that mandatory redemption feature made preferred stock a debt instrument); LLC Agreement § 4.2(b); *see also Color Tile*, 2000 WL 152129, at *5 (same).

[209] *See* LLC Agreement §§ 4.2(b)-(c) (conditioning redemption on satisfaction of conditions); *id.* at Ex. A-6 (defining "Full Redemption Conditions").

occasional use of colloquialisms like "lender" in informal emails override the text of the definitive agreement and evidence of the parties' overarching intent.[210]

Accordingly, the Investor's contribution to the Company is an equity investment. It is not subject to usury restrictions. Judgment on Counterclaim VI is entered for the plaintiffs/counterclaim defendants.

### c. The Constitutional Claims

Counterclaims IV and V rise and fall with the determination that the transaction is equity.[211] Counterclaim IV concerns the contention that the Investor's contribution is a usurious loan in violation of Article XV of the California Constitution.[212] Counterclaim V asserts a direct claim on the same basis.[213] Both fail.

Usury laws generally apply only to debt instruments, such as loans or forbearances, not to equity investments.[214] As explained above, the Investor's

---

[210] *See Wolfensohn*, 253 A.2d at 75.

[211] PTO 4-5.

[212] *Id.*

[213] *Id.*

[214] *See, e.g., NY Cap. Asset Corp. v. F&B Fuel Oil Corp.*, 98 N.Y.S.3d 501, at *6 (N.Y. Sup. Ct. 2018) ("Usury laws . . . apply only to loans or forbearance, not investments."); *Ghirardo*, 8 Cal. 4th at 798 (explaining that usury laws apply only to "loan[s]" or "forebearance[s]"); *see also* 6 *Del. C.* § 2304(a) (defining usury as "the charge to a borrower by a lender, directly or indirectly, of a higher rate of interest than that permitted by law").

41

contribution was a preferred equity investment. Because no loan exists, no usury violation can occur.[215] Judgment on Counterclaims IV and V is in the plaintiffs/counterclaim defendants' favor.

### 3. The Proniloff Claims (Counterclaims I, II, III)

The defendants advance three counterclaims arising from the same set of facts. Gortikov Investments, Inc.—Gortikov's brokerage entity—paid a $21,000 referral fee to Greg Proniloff in connection with the transaction. The defendants assert that this payment violated the LLC Agreement, and that the plaintiffs fraudulently concealed Proniloff's financial interest to induce Nerush to close the deal. As relief, they seek rescission.

The defendants/counterclaim plaintiffs have not proven these counterclaims. The breach of contract claim is meritless because a warranty on commissions was accurate, and rescission is unwarranted because the payment was immaterial to the deal's economics. The fraud claim is meritless. And the "fraudulent concealment" claim fails because nothing was concealed, and Gortikov had no duty to disclose the information at issue otherwise.

---

[215] *See Langille v. Cent.-Penn Nat'l Bank of Phila.*, 153 A.2d 211, 213 (Del. Ch. 1959) (holding that, when a "violation of a usury statute is alleged," the usury analysis turns on "whether the transaction in question was the kind of transaction which it was the intention of the legislature to prevent").

### a. Breach of Contract (Counterclaim II)

The defendants/counterclaim plaintiffs claim that the Investor breached Section 6.3 of the LLC Agreement because Gortikov paid Proniloff a $21,000 commission. Section 6.3 of the LLC Agreement provides:

> Except for Gortikov Investments, Inc., d/b/a Gortikov Capital, each Member (a) represents and warrants to each other Member that neither it nor its Affiliates have dealt with any brokers, investment bankers, consultants or other Third Parties *who are entitled to receive a commission or compensation* in connection with the formation and capitalization of the Company . . . and (b) agrees to indemnify, defend and hold the Company. . . harmless from and against any Losses for or relating to any claims for commissions or any other fees due . . . .[216]

The defendants assert that the $21,000 payment to Proniloff breached this warranty.[217] As a remedy, they request rescission of the entire transaction.[218] Their claim fails for two reasons.

---

[216] LLC Agreement § 6.3 (emphasis added).

[217] Defs.' Post-trial Opening Br. 17-18.

[218] *Id.* at 19.

First, the Investor did not breach Section 6.3.[219] The warranty applies only to third parties who are "entitled to receive" a commission.[220] The term "entitled" means "having a right to certain benefits or privileges."[221]

Proniloff, however, had no right to a payment. No agreement obligated Gortikov, the Investor, or the Company to pay Proniloff any amount.[222] Gortikov Investments paid Proniloff a "voluntary referral fee" out of its own commission as a professional courtesy for helping to facilitate the transaction.[223] Because Proniloff was not entitled to the payment—either when the LLC Agreement was executed or later—the representation in Section 6.3 was accurate.

Second, even if the payment constituted a technical breach, it was an immaterial one that cannot support rescission. The equitable remedy of rescission "is not given for every serious mistake" and "is awarded as a matter of judgment."[224]

---

[219] *See generally Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995) (setting forth elements for breach of contract); *see also supra* note 112 and accompanying text (summarizing the elements for a breach of contract claim); *supra* notes 107-109 (summarizing the applicable principles of contract interpretation).

[220] LLC Agreement § 6.3.

[221] *Entitled*, Merriam-Webster, https://www.merriam-webster.com/dictionary/entitled (last visited Feb. 22, 2026).

[222] Gortikov Tr. 98-99.

[223] *Id.* at 98.

[224] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P*, 817 A.2d 160, 174 (Del. 2002); *see also In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *14 (Del. Ch. Jan. 5, 2010) ("[R]escission is an equitable remedy that a court of equity will only grant, as an exercise of discretion, when that remedy is clearly warranted.").

It is "not generally permitted for casual, technical, or unimportant breaches, or where the breach is incidental or subordinate to the main purpose of the contract."[225] The breach must be "substantial or material."[226]

Here, the challenged payment was de minimis: $21,000 in the context of a $10.5 million investment. It caused no harm to the defendants. The fee came from Gortikov Investments' own commission after-the-fact. It neither increased the Company's expenses nor altered the deal's economics.[227]

The defendants maintain that the purported breach was material because it created a conflict of interest for Proniloff, depriving Nerush of unbiased advice from WS.[228] But this argument relies on the false premise that Proniloff was Nerush's agent. He was not. Proniloff was the representative of the 10% Owner, an adverse counterparty to Nerush.[229] Proniloff owed Nerush no duty, and Gortikov's

---

[225] 26 *Williston on Contracts* § 68:2 (4th ed.).

[226] *Id.*; *see also BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) (explaining that the materiality of a breach is a question "of degree"); Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981) (identifying factors to be examined when considering whether a breach is material, including "the extent to which the injured party will be deprived of the benefit which he reasonably expected[,]" "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived[,]" and "the extent to which the party failing to perform or to offer to perform will suffer forfeiture").

[227] Gortikov Tr. 99.

[228] Defs.' Post-trial Opening Br. 18.

[229] Nerush Tr. 492-93; Proniloff Dep. 199.

post-closing payment to Proniloff created no conflict that could legally harm the defendants.

###### b.    Fraud (Counterclaim III)

The defendants seek to repackage their claim for breach of Section 6.3 as fraud. They assert that the plaintiffs falsely warranted that no consultant was entitled to a commission.[230]  The fraud claim fails as a matter of law.

To prevail on a fraud claim, a party must prove: (1) a false representation; (2) knowledge of its falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) damages.[231]  The defendants allege that the plaintiffs committed fraud by falsely representing in Section 6.3 of the LLC Agreement that no consultant was "entitled to receive a commission."[232]  They contend they relied on this representation and would not have closed the deal had they known Proniloff would receive a fee.[233]

The defendant/counterclaim plaintiffs' claim fails on the first fraud element. As explained above regarding the breach of contract counterclaim, the representation in Section 6.3 was accurate.  The provision warranted that no third party was "entitled to receive a commission."[234]  Because Proniloff had no contractual right to

---

[230] Countercl. ¶¶ 38-39; PTO ¶ 4.

[231] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[232] LLC Agreement § 6.3; PTO ¶ 4.

[233] Countercl. ¶¶ 38-39; PTO 4.

[234] LLC Agreement § 6.3.

46

the payment—and received it only as a discretionary referral fee—the Investor and Gortikov did not make a false statement when executing the LLC Agreement.[235]

Even if the representation were false, the claim would be barred by the anti-bootstrapping rule. Delaware law generally prohibits "bootstrapping" a breach of contract claim into a fraud claim.[236] A fraud claim can survive alongside a contract theory only if the allegations go beyond a mere failure to perform and involve separate conduct, such as an intention to "plunder" the counterparty or a scheme collateral to the contract.[237]

The defendants proved nothing of the sort. They simply point to a warranty in the contract, claim it was false, and seek rescission—the same argument and remedy as their breach of contract claim. This counterclaim contrasts with the plaintiffs' affirmative fraud claim, which concerns an undisclosed plan to lease the Property and collect rent.[238] Without such separate and distinct conduct or damages, the counterclaim is duplicative.[239]

---

[235] *See supra* note 35 and accompanying text.

[236] *Narrowstep*, 2010 WL 5422405, at *14-15.

[237] *Id.*

[238] *See supra* notes 126-141 and accompanying text.

[239] *Narrowstep*, 2010 WL 5422405, at *14-15; *see BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004).

c. "Fraudulent Concealment" (Counterclaim I)[240]

A second fraud counterclaim concerns a purported duty to disclose rather than affirmative misrepresentation.[241] The defendants/counterclaim plaintiffs allege that the plaintiffs concealed three facts about Proniloff: (1) Gortikov and Proniloff were friends; (2) Proniloff received a fee from Gortikov Investments; and (3) Proniloff's father was an investor in the fund Gortikov raised to finance the deal.[242] They argue that Gortikov had a duty to disclose this information because Proniloff was acting as Nerush's "agent" or "advisor," and the concealment deprived Nerush of unbiased advice.[243]

This claim fails for two reasons. First, the factual premise of the duty—that Proniloff was Nerush's agent—is false. Second, even if Proniloff were Nerush's

---

[240] PTO 3. The plaintiffs refer, erroneously, to the claim as one for "fraudulent concealment." Countercl. 8. Fraudulent concealment is a theory used to toll the statute of limitations. *E.g.*, *LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1147 (Del. 2025). But whether the statute of limitations has run is not at issue here, nor is it discussed in the counterclaim. Countercl. ¶¶ 21-30. Delaware law instructs me to look at the substance of a claim, not its form. *See Monroe Park*, 457 A.2d at 737 ("[E]quity regards substance rather than form." (citing 2 *Pomeroy's Equity Jurisprudence* §§ 378, 383)).

[241] *See NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *12-13 (Del. Ch. Aug. 2, 2023) (explaining that "fraud can occur in one of three ways: (1) an overt misrepresentation; (2) silence in the face of a duty to speak; or (3) active concealment of material facts" (citation omitted)).

[242] Countercl. ¶ 23.

[243] *Id.* ¶ 22.

48

agent, the plaintiffs had no duty to report these facts to a sophisticated counterparty in an arm's-length transaction.

i.      *Agency*

Under Delaware law, "[a]n agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."[244]  But at trial, Nerush admitted he never had a written or oral agency agreement with Proniloff, never told Gortikov that Proniloff was his agent, and never held Proniloff out as his agent.[245]  Nerush was also contractually obligated to obtain GC Broadway's approval before retaining an agent.[246]  He failed to do so.[247]

The evidence confirms that Proniloff was an employee of WS (the 10% Owner), a counterparty to the transaction.[248]  Other witnesses, including Nerush's own counsel, testified they never understood Proniloff to be acting as Nerush's agent.[249]  Because no agency relationship existed, there was no fiduciary conflict for the plaintiffs to conceal.

---

[244] *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57-58 (Del. 1997) (citation omitted); *see also* Restatement (Second) of Agency § 1 (Am. L. Inst. 1958).

[245] Nerush Tr. 492-93.

[246] *Id.* at 495; *see* LLC Agreement § 6.1(e)(iii).

[247] Nerush Tr. 495.

[248] *See supra* note 29 and accompanying text.

[249] Gotfredson Tr. 441 (testifying that he never believed that Proniloff acted, throughout the transaction, as a representative or agent of Nerush).

49

ii.     *Duty to Speak*

The plaintiffs had no special duty to Nerush that obligated them to disclose facts related to the investment.  In a commercial arm's-length transaction, there is no general duty to disclose facts "absent a special relationship," such as a fiduciary relationship.[250]  That is true even for facts that the other party might "regard as material in determining his course of action in the transaction in question."[251]

Here, the parties were sophisticated actors represented by separate counsel.[252] The plaintiffs owed no fiduciary duties to Nerush; in fact, the LLC Agreement expressly waived them.[253]  Proniloff was known to be an employee of WS, an adverse party.[254]  Thus, Gortikov had no duty to disclose his friendship with Proniloff or the details of Proniloff's compensation.  Nerush's decision to rely on

---

[250] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015) ("Absent a special relationship, a party is under no duty to disclose facts of which he knows the other is ignorant[.]" (citation omitted)); *see also Dolan v. Altice USA, Inc.*, 2019 WL 2711280, at *11 (Del. Ch. June 27, 2019) (explaining that a party "claiming equitable fraud must sufficiently plead a special relationship between the parties or other special equities, such as some form of fiduciary relationship or other similar circumstances" (citation omitted)).

[251] *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *6 n.51 (Del. Ch. Apr. 10, 2008).

[252] PTO ¶¶ 17, 19; LLC Agreement § 16.14.

[253] LLC Agreement § 10.1(b) (providing that "the Members, Managing Member and the Company hereby waive any and all fiduciary duties").

[254] *See* Nerush Tr. 492-93.

Proniloff was his own choice, not the result of actionable concealment by the plaintiffs.

### 4. The Funding Claims (Counterclaims VII and VIII)

The defendants' final set of counterclaims, amended to conform to proof under Rule 15(b), alleges that the plaintiffs fraudulently induced the transaction by misrepresenting the amount of capital raised. The defendants/counterclaim plaintiffs assert Gortikov falsely represented that GC Broadway had $10.5 million "sitting dormant" in a bank account at closing, when it had raised just $8.35 million.[255] Based on these allegations, the defendants press counterclaims for affirmative fraud (Counterclaim VIII) and "fraudulent concealment" (Counterclaim VII).[256]

Both claims are meritless. Judgment is entered for the plaintiffs on Counterclaims VII and VIII.

### a. Affirmative Fraud (Counterclaim VIII)

The defendants/counterclaim plaintiffs allege Gortikov affirmatively misrepresented that he had the full $10.5 million in hand. This claim fails for failure to prove a false statement was made to the defendants, or justifiable reliance.[257]

---

[255] Defs.' Mot. to Amend ¶ 7.

[256] *See supra* note 240 (explaining that the fraudulent concealment claims are considered fraud theories).

[257] *See supra* note 231 and accompanying text (listing the elements of a fraud claim); *see also Stephenson*, 462 A.2d at 1074.

First, the defendants failed to show that a false representation was made to them.[258] At trial, Nerush admitted Gortikov never spoke to him about the specific amount of funds raised before closing.[259] Instead, the defendants rely on an email Gortikov sent to Proniloff stating, "we have had $10.5 million of our investor funds sitting dormant in our account," another email where Gortikov asked Proniloff to tell Nerush "I am giving him $10.5 million," and Nerush's statement that Proniloff repeated this statement to him.[260]

Nerush's testimony on what Proniloff told him about Gortikov's statements is inadmissible hearsay.[261] Proniloff did not testify at trial to corroborate that the message was conveyed. Without competent evidence linking Gortikov's email to a statement made to the defendants, the chain of representation is broken. As for the emails, they are neither false nor misleading. They accurately represent that the Investor would be investing $10.5 million in the Company and the 10% Owner.

---

[258] *Prairie Cap.*, 132 A.3d at 49 (explaining that "[t]o plead fraud, a plaintiff must identify a false representation" made to it by defendant).

[259] Nerush Tr. 479-82; *see also* Defs.' Opening Post-trial Br. 2-3 (admitting "there is no evidence that Gortikov made that misrepresentation [regarding the amount of funds Plaintiffs had raised] directly to Nerush").

[260] JX 99; *see* Nerush Tr. 535, 542-44; *see also* Gortikov Tr. 92-93 (acknowledging that the email was an exaggeration); Defs.' Post-trial Opening Br. 3.

[261] *See* Del. R. Evid. 801(c) (defining hearsay as an out of court statement offered "to prove the truth of the matter asserted"); Del. R. Evid. 802.

Second, the defendants cannot establish justifiable reliance.[262] The LLC Agreement—the definitive document governing the transaction—does not represent that the Investor holds $10.5 million in cash. It merely states the Investor "has contributed or is ***deemed to have contributed***" that amount.[263] This language put the defendants on notice that the contribution was a "deemed" value, not necessarily a cash balance. None of the representations made by the plaintiffs are inconsistent with those terms.

In any event, Nerush admitted he did not read the LLC Agreement.[264] Nerush cannot credibly justify his reliance on oral representations that differ from the terms of a written contract he chose not to read.[265]

---

[262] *See supra* note 231 and accompanying text (listing justifiable reliance as an element of a fraud claim).

[263] LLC Agreement § 2.2 (emphasis added).

[264] Nerush Tr. 482.

[265] *See REM OA Hldgs.*, 2023 WL 6143042, at *20 (stating that "a party's failure to read a contract or insistence that she had not been informed of [its] stated terms" does not "vitiate . . . [her] written assent" (citing *Pellaton*, 592 A.2d at 477)), *aff'd*, 320 A.3d 237 (Del. 2024) (TABLE); *Liborio III, L.P. v. Artersian Water Co.*, 2023 WL 1981824, at *7-8 (Del. Super. Feb. 14, 2023) (explaining that a party who was "more than adequately represented by counsel . . . failed to fully read its contracts and related documents, so it cannot possibly claim that reliance on a[] . . . verbal representation. . . was reasonable"), *rev'd on other grounds*, 306 A.3d 529 (Del. 2023) (TABLE); *Kosachuk v. Harper*, 2002 WL 1767542, at *2, *5-6 (Del. Ch. July 25, 2002) (explaining that a party who "ha[s] an obligation to read and understand" the relevant documents "cannot justify its avoidance by claiming that he did not read it").

### b. "Fraudulent Concealment" (Counterclaim VII)

Finally, the defendants/counterclaim plaintiffs allege that the plaintiffs failed to disclose the purported "shortfall" in raised capital.[266] They insist that the "deemed to have contributed" language in the LLC Agreement was a "half-truth" that created a duty to disclose the actual cash position.[267] But, once again, this claim fails because there was no duty to disclose in the context of this arm's-length transaction.[268]

Nor was the contract language misleading. Section 2.2 accurately defined the "deemed" value of the equity for calculating returns and ownership.[269] It was not a representation of liquidity.

The purportedly concealed fact was also immaterial to the transaction's failure. The Investor ultimately contributed over $10.5 million to the project and never defaulted on a funding obligation.[270] The project stalled due to defendants' leasing breaches, not a lack of available capital.

---

[266] Defs.' Opening Post-trial Br. 10-11.

[267] *Id.*

[268] *See supra* note 250 and accompanying text (explaining that a fraud claim based on concealment requires a duty to disclose); *Ashland v. The Samuel J. Heyman 1981 Continuing Tr.*, 2018 WL 3084975, at *11 (Del. Super. June 21, 2018) (same); *Prairie Cap.*, 132 A.3d at 52 (same); *Matthews Office Designs, Inc. v. Taub Invs.*, 1994 WL 267479, at *2 (Del. 1994) (same).

[269] LLC Agreement § 2.2.

[270] Gortikov Tr. 88.

5.    Affirmative Defenses

The defendants assert numerous affirmative defenses to the enforcement of the Payment Guaranty, including usury, prior material breach of contract, fraud in the inducement, and unclean hands.[271]  These defenses rely on the same factual and legal theories underlying the counterclaims rejected above.

I have determined that the transaction involved preferred equity, the plaintiffs did not materially breach the LLC Agreement, and no actionable fraud by the plaintiffs occurred.  The corresponding affirmative defenses necessarily fail.[272]

The usury defense is groundless because the instrument is equity, not debt.[273]

The defense that the Proniloff payment excused the defendants' performance is likewise baseless because the payment caused—at best—an immaterial technical breach of the LLC Agreement.[274]  The same is true of the failure of consideration defense.[275]  The Investor contributed over $10.5 million to the project as required

---

[271] Defs.' Am. Ans. to the First Am. Compl. with Aff. Defenses (Dkt. 233) ("Aff. Defenses") 39-41.

[272] *See, e.g.*, *Kuroda*, 971 A.2d at 891 (dismissing an unclean hands defense where it was duplicative of failed counterclaims).

[273] *See supra* Section II.B.2.

[274] *See supra* Section II.B.3.a.

[275] *See supra* Section II.B.4.

and never defaulted on a capital call.[276]  A dispute over when the funds were raised is immaterial where the consideration was actually delivered.[277]

The defenses of fraud and unclean hands fail because the plaintiffs made no actionable misrepresentations and owed no duty to disclose the "concealed" facts. As a result, they did not engage in the sort of inequitable conduct required to bar relief.[278]

Accordingly, the affirmative defenses are rejected in full.

## III.   REMEDIES

The plaintiffs request several forms of relief from Nerush.[279]  For breach of the Payment Guaranty (Count III) and fraud (Count IV), they seek money damages

---

[276] *See* Gortikov Tr. 88; *see also* JX 219 (confirming that the Investor "is not in default under the LLC Agreement").

[277] *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *13-14 (Del. Ch. Jan. 25, 2013) (noting that substantial performance defeats a material breach defense).

[278] *See Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 n.26 (Del. Ch. 1998) (explaining that the doctrine of unclean hands requires conduct that is "offensive to the dictates of natural justice" or inequitable).

[279] The plaintiffs obtained summary judgment on their claims for declaratory relief regarding control of the Company (Count I) and an anti-suit injunction (Count II).  The Pre-trial Order noted that the damages phase for Counts I and II, including the plaintiffs' demand for attorneys' fees and costs specifically related to those counts, remained to be resolved.  Because the trial focused on the monetary damages under Counts III and IV and the counterclaims, the parties must confer on and propose a schedule for supplemental submissions to resolve any outstanding damages or fees exclusively related to Counts I and II.

totaling $13,117,659 plus interest.  They also seek attorneys' fees and costs under a fee shifting provision in the LLC Agreement.

## A.    Damages for Breach of Contract (Count III)

The Company failed to redeem the Investor's interest by paying the "Full Redemption Price" by the "Redemption Date" (September 30, 2024).[280]  The "Full Redemption Price" is defined in the LLC Agreement to include all unreturned capital contributions, any unpaid "Company Loans" (including interest), all "Investor Member Expenses," the contractual "Exit Fee," and "Accrued PIK" (unpaid preferred returns).[281]  Payment of the Full Redemption Price is designed to put the Investor in the position it would have enjoyed had the Company performed under the LLC Agreement by causing the redemption to occur.[282]

---

[280] PTO ¶¶ 53-54.

[281] *See* LLC Agreement § 4.1(e)(i) (defining "Full Redemption Price" to include "all Unreturned Capital Contributions," "all accrued and outstanding interest . . . on Company Loans made by Investor Member," the principal of such Company Loans, "all unpaid Investor Member Expenses," and the "Exit Fee"); *see also id.* § 1.8 (addressing "Investor Member Expenses"); *id.* § 2.4 (defining "Company Loans"); *id.* § 4.1(c) (defining "Accrued PIK" as any "Preferred Return or Enhanced Preferred Return not paid when due"); *id.* at Ex. A-6 (defining "Exit Fee"); *id.* at Ex. A-12 (defining "Preferred Return"); *id.* at Ex. A-5 (defining "Enhanced Preferred Return").

[282] *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (explaining that expectation damages are "measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract"); *Genencor Int'l v. Novo Nordisk, A/S*, 766 A.2d 8, 11 (Del. 2000) (stating that "remedy for a breach should seek to give the nonbreaching . . . party the benefit of its bargain by putting that party in the position it would have been but for the breach").

Because the Company failed to pay, Nerush is personally liable under the Payment Guaranty.[283] Although the Company—the primary obligor—is also liable, judgment on Count III is only against Nerush as the guarantor. The Payment Guaranty guarantees payment (not just collection).[284] At the same time, the Payment Guaranty limits Nerush's personal liability, "excluding Company Loans made under Sections 2.4 and 3.2(f) of the [LLC] Agreement to repay or refinance the initial principal amount of the Loan or accrued interest thereon[.]"[285]

In addition, Section 6.5(b) of the LLC Agreement limits the Investor's damages:

> [U]nder no circumstances shall [the Investor] be entitled to any lost profits or consequential, special or punitive damages except if such damages are actually paid to an unaffiliated third party . . . .[286]

To show their damages, the plaintiffs primarily rely on the testimony of Gortikov and a summary spreadsheet he prepared that purportedly calculates the

---

[283] Payment Guaranty § 1.1 (showing that Nerush "unconditionally guarantee[d] payment" of the Full Redemption Price immediately upon the Company's default).

[284] *Id.* § 1.2(a) ("Guarantor hereby assumes liability for, hereby agrees to pay, and hereby guarantees the punctual payment to Investor, and not merely the collectability, of the Full Redemption Price . . . .").

[285] Payment Guaranty § 1.2(a); *see* LLC Agreement §§ 2.4, 3.2(f).

[286] LLC Agreement § 6.5(b).

unreturned capital, accrued preferred returns, and other potential losses.[287] The defendants object to the spreadsheet as inadmissible hearsay and unreliable.[288]

I disagree that the spreadsheet is hearsay but find it largely without a solid evidentiary foundation. Gortikov is competent to testify to the Investor's capital contributions and payments made to third parties, yet many of the figures in the spreadsheet are unverified and lack backup.[289] Gortikov admitted that he prepared the spreadsheet for litigation.[290]

The relevant agreements and reliable evidence support the following damages:

- Unreturned Capital: $7,946,396. This amount is undisputed. The LLC Agreement establishes the initial capital contribution of $10.5 million. The First and Second Amendments to the LLC Agreement, signed by Nerush, state the outstanding capital balance at those times.[291] Bank records confirm the paydowns made by Sponsor.[292]

- Recoverable Third-Party Expenses: $277,239. As the plaintiffs proved, they advanced funds to third parties to cure the defendants' defaults. Gortikov's testimony on these advances is supported by receipts and bank records. Under the LLC Agreement, the advances are "Company

---

[287] JX 341; JX 341-N; Gortikov Tr. 62-63.

[288] Defs.' Post-trial Closing Br. 6-11 (objecting to the admission of JX 341 and JX 341-N).

[289] Gortikov Tr. 170; *see id.* at 134-36; *see also Beard Rsch. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (explaining that "[r]esponsible estimates of damages . . . are permissible so long as the court has a basis to make such a responsible estimate"), *aff'd sub nom.*, *ASDI v. Beard Rsch.*, 11 A.3d 749 (Del. 2010).

[290] *Id.* at 147-50; *see also* JX 341 (Note 1).

[291] JX 193 (First Am.); JX 219 (Second Am.).

[292] JX 341-N; Gortikov Tr. 146.

Loans" or "Investor Member Expenses" that are added to the Full Redemption Price.[293] They are not subject to the carve-out in Section 1.2(a) of the Payment Guaranty.[294]

- o <u>Past Tax and Insurance Payments</u>: $230,091. The plaintiffs proved they paid property taxes and insurance premiums to protect the asset. These payments are shown by tax receipts[295] and by bank records.[296]

- o <u>Past Development Costs</u>: $35,825. The plaintiffs also proved that they paid architectural fees necessary for entitlements. The payments are supported by the architect's invoice[297] and bank records.[298]

- o <u>Past Entity Expenses</u>: $11,323. The plaintiffs further proved payment of necessary filing fees and state taxes to maintain the Company's good standing, supported by bank records.[299]

- <u>Exit Fee</u>: $79,464. The "Exit Fee" is a contractual fee owed to the Investor upon redemption and a component of the Full Redemption Price.[300] It is contractually fixed at 1% of the capital contributions under the LLC Agreement.[301] This figure is derived from a simple

---

[293] LLC Agreement § 2.4; *id.* § 1.8.

[294] Payment Guaranty § 1.2(a); *see supra* note 285 and accompanying text. The parties did not brief the carve out. In fact, the plaintiffs excluded it when quoting the remainder of the provision. Pls.' Post-trial Opening Br. 14-15 ("The Payment Guaranty states: 'Guarantor hereby assumes liability for, hereby agrees to pay, and hereby guarantees the punctual payment to Investor, and not merely the collectability, of the Full Redemption Price … collectively, the 'Guaranteed Obligations.'" (quoting Payment Guaranty § 1.2(a))).

[295] JX 303.

[296] JX 349.

[297] JX 302.

[298] JX 349.

[299] *Id.*

[300] LLC Agreement Ex. A-6 (defining "Exit Fee"); *see also* LLC Agreement § 4.1(e)(i).

[301] *Id.* § 4.1(e)(i).

mathematical calculation based on the undisputed capital contributions.[302]

- Less Credits: ($869,339). The plaintiffs properly credited the defendants for the balance of the investor reserves—funds held back by the Investor to pay certain costs—and associated interest.[303]

I deny the remaining amounts sought by the plaintiffs for Count III. The plaintiffs failed to meet their burden of proof for the following categories:

- Senior Loan Payments: $678,954. The plaintiffs advanced this amount to the senior lender to cure defaults caused by the Sponsor.[304] Although the payments constitute "Company Loans," they were made to repay principal and interest in the senior loan, placing them within the exclusion of Section 1.2(a) of the Payment Guaranty.[305] Although the Company remains liable for this debt, Nerush is not personally liable for it under the Payment Guaranty.

- Accrued PIK: $3,506,820. The request for "Preferred Returns" and "Enhanced Preferred Returns" is denied.[306] The calculation rests on Gortikov's litigation spreadsheet and what Gortikov described as "published data" for the floating secured overnight financing rate (SOFR), which he could not identify or authenticate.[307] The plaintiffs also admitted to using the "Preferred Return Reserve" to pay themselves returns during this period.[308] But the record does not show

---

[302] $10.5 million x 1% = $105,000, less amounts previously paid. *See* Gortikov Tr. 161-62.

[303] JX 341-N; Gortikov Tr. 164-70.

[304] JX 300; JXs 311-12.

[305] Payment Guaranty § 1.2(a) (excluding "Company Loans" made to "repay or refinance . . . the Loan").

[306] *See* LLC Agreement § 4.1(c) (defining "Accrued PIK" as "[a]ny Preferred Return or Enhanced Preferred Return not paid when due"); *id.* at Ex. A-12 (defining "Preferred Return"); *id.* at Ex. A-5 (defining "Enhanced Preferred Return").

[307] Gortikov Tr. 147-50; JX 341-N.

[308] *See* LLC Agreement § 2.2(b) (establishing the "Preferred Return Reserve"); Gortikov Tr. 168 (confirming that the reserve was used to pay GC Broadway its preferred return);

61

how these payments were credited against the "Accrued PIK" balance claimed in Gortikov's spreadsheet.[309]  Awarding the lump sum sought for Accrued PIK alongside the retention of the reserves could result in a double recovery.  The plaintiffs provided no third-party bank statements or validated interest schedules to support this multimillion-dollar figure or to disentangle the credits.

- Contractual Interest: $47,612.  The plaintiffs' request for this lump sum in interest on the advances (loan and tax payments) is also denied.[310]  Like the Accrued PIK figure, the specific calculation rests on the unverified spreadsheet without independent support.[311]  The record lacks underlying data, such as the date each advance was made, to allow me to verify the interest calculation.[312]

- Future Damages: ~$1.15 million.  The plaintiffs also request future loan payments, taxes and pre-development costs.  I reject the offered amounts as speculative.  They have not been incurred and rely only on Gortikov's unsupported estimates of how long it might take to sell the Property.[313]

The total principal damages for Count III are $7,433,760, before interest.[314]

---

*id.* at 169 (testifying that the Preferred Return Reserve was administered by GC Broadway "to pay itself its preferred return" and that the reserve was "exhausted fully").

[309] *See* JX 341-N; Gortikov Tr. 147-50.

[310] This issue is separate from whether the plaintiffs are entitled to prejudgment interest at the contractual rate, which I address below.

[311] JX 341-N.

[312] For example, I do not know when the $678,954 senior loan payment or the $240,091 tax payment was made.

[313] Gortikov Tr. 151-53; *see* JX 341-N.

[314] $7,946,396 (capital) + $277,239 (expenses) + $79,464 (Exit Fee) - $869,339 (credits) = $7,433,760 principal damages.

## B.     Fraud Damages (Count IV)

The plaintiffs proved that the defendants fraudulently concealed their intent to lease the Property and misappropriated the resulting rent from the Occupants.[315] The standard remedy for fraud is expectation or "benefit-of-the-bargain" damages, which are measured by the amount of money that would "put the plaintiff in the same financial position [it] would have been in if the defendant's representations [were] true."[316] That measure is inapt here, where the Property would be vacant had Nerush's representations been accurate.     Delaware law also provides for restitutionary relief so that a wrongdoer may not profit from his misconduct.[317] Even if the Investor's primary goal was a vacant building, Nerush should not retain the ill-gotten gains from the unauthorized lease.[318]

Nerush admitted at trial that he collected at least $300,000 in rent from the Property and deposited it into the account of AN Properties—his personal

---

[315] *See supra* Section II.C.

[316] *Stephenson*, 462 A.2d at 1076.

[317] *See Shuttleworth v. Abramo*, 1994 WL 384428, at *4 (Del. Ch. July 14, 1994) (observing that "[g]enerally, the remedies for fraud are restitution or damages").

[318] *Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999) ("Restitution serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988))).

affiliate.[319]  Additional evidence supports this figure.[320]  The appropriate sum of restitution is thus $300,000.[321]

Restitutionary damages can return misappropriated property to the entity that was defrauded—here, the Company.  The Recourse Guaranty establishes that the Investor is directly entitled to these funds.[322]  Under the Recourse Guaranty, Nerush agreed to be personally liable for "Recourse Liabilities," which include any "misappropriation . . . of . . . any Rents."[323]  Because the Investor has a priority claim on Company assets that far exceeds $300,000, the damages rightly belong to the Investor.[324]

---

[319] Nerush Tr. 456-58.

[320] *See* JX 346 (rent checks); Moghadam Dep. 44-47.

[321] *Geronta Funding v. Brighthouse Life Ins.*, 284 A.3d 47, 64 (Del. 2022) (explaining that "the measure of recovery [for restitution] is . . . based not on the plaintiff's loss, but on the defendant's gain" (citing *Restitution*, Black's Law Dictionary (11th ed. 2019))).

[322] Recourse Guaranty § 1.2.

[323] *Id.*; *id.* at Ex. A § (d)(iv) (defining "Recourse Liabilities" to include "any Rents (as such term is defined in the Deed of Trust)"); JX 42 (Deed of Trust; defining "Rents" to include "all rents, issues, profits, damages, royalties, income and other benefits now or hereafter derived from the [Property]").

[324] *See* LLC Agreement § 4.1(d) (establishing the priority of distributions).  Under the waterfall established by the LLC Agreement, net cash flow must be distributed to the Investor to satisfy Unreturned Capital Contributions and Accrued PIK before any distributions are made to the Sponsor.  Because the Investor's outstanding claim (over $7.9 million) well exceeds the misappropriated amount ($300,000), the Investor would have been entitled to 100% of these funds had they been directed to the Company rather than misappropriated by Nerush.  *Id.*

Accordingly, judgment is entered against Nerush on Count IV in the amount of $300,000.

## C.    Interest

The plaintiffs are entitled to pre- and post-judgment interest on the monetary damages awarded to them.[325]  The applicable rates differ for the contract and fraud claims.

For the judgment on Count III, the parties bargained for specific rates of return.  The LLC Agreement applies a "Preferred Return" rate of at least 19% to capital contributions and a separate "Company Loan Interest Rate" of 21.5%, compounded monthly, to "Company Loans."[326]  Under Delaware law, the judgment bears interest at the rate identified in the contract.[327]  The contractual rates apply to both pre- and post-judgment interest calculations for certain liabilities, as follows:

- Net Unreturned Capital: $7,077,057.  This figure represents the gross unreturned capital ($7,946,396) less credits and reserves held by the investor ($869,339).  Interest will accrue on this net amount at the

---

[325] *See Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) ("In Delaware, prejudgment interest is awarded as a matter of right.").

[326] LLC Agreement Exs. A-4, A-12 (defining "Preferred Return" and "Company Loan Interest Rate"); *id.* § 2.4 (defining "Company Loan"); *see also id.* § 4.1(c) (accrual of Preferred Return); *id.* § 2.4 (interest on Company Loans).

[327] 6 *Del. C.* § 2301(a) (providing that an "expressed contract rate" governs when present); *see id.* § 2301(c) (removing the cap on post-judgment interest at the lower of the legal or contractual rate for commercial transactions exceeding $100,000); *see also Sequoia Presidential Yacht Gp. LLC v. FE P'rs, LLC*, 2014 WL 2610577, at *2-3 (Del. Ch. June 12, 2014) (awarding pre- and post-judgment interest "at the agreed-upon contract rate of 8.75%" rather than the legal rate).

contractual "Enhanced Preferred Return" rate—defined as the Preferred Rate plus 5.0%—compounded monthly from the Redemption Date (September 30, 2024).[328]

- Recoverable Third-Party Expenses: $277,239. Interest will be applied to this amount at the contractual rate of 21.5% per annum, as specified in Section 2.4 of the LLC Agreement for Company Loans.[329] It will accrue from the date each respective advance was made.

- Exit Fee: $79,464. The "Exit Fee" is a fixed amount with no specified interest rate in the contract.[330] Interest will therefore accrue at the statutory legal rate from the Redemption Date (September 30, 2024).

For the fraud damages on Count IV ($300,000), interest is governed not by the LLC Agreement but by statute.[331] The plaintiffs are awarded pre- and post-judgment interest at the statutory legal rate. The interest will be compounded quarterly, which "better reflects the financial realities of conducting business" than flat interest.[332]

---

[328] LLC Agreement at Ex. A-12 (defining "Preferred Return" as "the greater of (i) SOFR Rate . . . and (ii) 19.00%, compounded monthly"); *id.* at Ex. A-5 (defining "Enhanced Preferred Return" as the Preferred Return plus 5%); *see also id.* § 4.1(c) (providing that the Enhanced Preferred Return applies upon a "Removal Event"); *id.* § 5.6(a) (defining "Removal Event" to include, among other things, fraud).

[329] *See id.* § 2.4.

[330] *Id.* at Ex. A-6 (defining "Exit Fee").

[331] *See* 6 *Del. C.* § 2301.

[332] *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022); *see also Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *12 (Del. Ch. May 20, 2004) (explaining that when the court "award[s] the legal rate of interest, the appropriate compounding rate is quarterly").

The legal rate is 5% over the Federal Reserve discount rate, including any surcharge as of the time from which interest is due.[333] Interest will run from the dates each rent payment from Modern Aesthetica and/or Dandada was misappropriated.[334]

**D.    Fee Shifting**

Finally, the plaintiffs seek an award of the attorneys' fees and costs they incurred in this action. Delaware follows the American Rule, under which each party must pay its own legal fees and costs unless a statute or contract provides otherwise.[335] Here, the operative agreements contain fee-shifting provisions that entitle the prevailing party to recover its reasonable attorneys' fees.

The LLC Agreement states that in any litigation arising out of the agreement, "upon a final non-appealable judgment . . . the prevailing party shall immediately be reimbursed by the other party for its costs and expenses (including reasonable legal fees and expenses)."[336] The Payment Guaranty likewise requires the Guarantor

---

[333] *See* 6 *Del. C.* § 2301(a).

[334] *See* JX 346. This exhibit reflects 16 monthy rent payments of $20,000 to Nerush, beginning on August 14, 2023, totaling $320,000. *Id.* Because damages on Count IV are $300,000, interest will run on each $20,000 payment chronologically until the principal sum is reached.

[335] *See Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007) ("Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs. An exception to this rule is found in contract litigation that involves a fee shifting provision.").

[336] LLC Agreement § 16.13.

(Nerush) to reimburse the Investor for "any and all reasonable costs and expenses (including court costs and reasonable attorneys['] fees and expenses) incurred" in connection with the enforcement of the Guarantor's obligations.[337] The Recourse Guaranty similarly contains a reimbursement provision for "all reasonable costs and expenses (including court costs and reasonable attorneys' fees and expenses)" incurred by the Investor in enforcing the guaranty.[338]

The plaintiffs are the prevailing party. They successfully enforced the Payment Guaranty to recover the Full Redemption Price (Count III), enforced the Recourse Guaranty to recover damages for fraud (Count IV), and prevailed on the declaratory relief claim (Count I). The defendants neither obtained relief on their counterclaims for rescission and usury nor prevailed on their affirmative defenses.

Accordingly, the plaintiffs are entitled to their reasonable attorneys' fees and costs. They must file an affidavit under Court of Chancery Rule 88 detailing their fees and expenses within ten business days of this decision. The defendants will then have ten business days to file any opposition to the Rule 88 affidavit. Consistent with Section 16.13 of the LLC Agreement, the defendants' obligation to pay the fee

---

[337] Payment Guaranty § 1.7.

[338] Recourse Guaranty § 1.7.

and expense award will become enforceable upon this court's judgment becoming final and non-appealable.[339]

## IV. CONCLUSION

Judgment on Counts III and IV is entered for the plaintiffs. Judgment on Counterclaims I through VIII is entered for the plaintiffs/counterclaim defendants.

The plaintiffs are awarded damages against Nerush of $7,433,760 for Count III and $300,000 for Count IV, together with pre- and post-judgment interest and reasonable attorneys' fees and costs as outlined above. The parties must confer on and submit a form of implementing order consistent with this opinion, including a proposed interest calculation, within ten business days. As noted above, they must also propose a schedule to resolve any remaining issues regarding remedies for Counts I and II.

---

[339] LLC Agreement § 16.13.